**ROBERT PFAFF**
**I.R.C. SECTION 6707 PENALTY**
**BOND LINKED ISSUE PREMIUM STRUCTURE, FOREIGN LEVERAGED**
**INVESTMENT PROGRAM, & OVERSEAS PORTFOLIO INVESTMENT STRATEGY**
**TRANSACTIONS**

<u>ISSUE:</u>

Whether Robert Pfaff is subject to penalties under I.R.C. § 6707 for failure to register the FLIP/OPIS and BLIPS transactions at issue as tax shelters as required by I.R.C. § 6111.

<u>FACTS:</u>

I.    **Robert Pfaff**[1]
     A.    **Tax Evasion Conviction**

On December 17, 2008, Robert Pfaff (hereinafter "Pfaff") was convicted of twelve counts of tax evasion. The twelve counts related to clients who participated in BLIPS transactions, and included two counts of evading his own personal tax liability through use of the BLIPS transaction.[2] On August 27, 2010, the United States Court of Appeals for the Second Circuit upheld Pfaff's conviction.[3]

     B.    **Education and Professional Experience**

Pfaff earned a Bachelor of Arts degree in Business Administration, with a concentration in finance and accounting, from the University of Wisconsin at Oshkosh. Pfaff also holds a law degree from Southwestern University School of Law. He was admitted to the California State Bar in 1980, but is currently ineligible to practice law. Pfaff was previously registered as a Certified Public Accountant.[4]

Prior to joining Presidio Advisors LLC, Pfaff worked for KPMG as partner in the Tax Department. Pfaff spent part of his career with KPMG at the organization's Paris office.[5] While in the Paris office, Pfaff worked with Jeff Stein and Helge Vilhelmsen, individuals involved with the development and implementation of the FLIP/OPIS and BLIPS shelters.[6] At KPMG, Pfaff was part of the team that developed the FLIP transaction.[7] In mid-1997, Pfaff left KPMG to start Presidio Advisors LLC.

     C.    **Presidio Advisors LLC and Related Entities**
         i.    **Presidio Advisors LLC**

In 1997, Pfaff, along with John Larson (hereinafter "Larson") and Norwood Holdings, Inc. (hereinafter "Norwood") formed Presidio Advisors LLC (hereinafter "PA"). At the time of formation, Pfaff owned 35% of PA, Larson owned 35%, and Norwood owned 30%. Pfaff also held a stake in PA through his grantor trust's 20% ownership interest in Norwood.[8]

By December 31, 1998, Pfaff and Larson transferred their 35% ownership interests in PA to Prevad, Inc. (hereinafter "Prevad"). Pfaff and Larson each owned 50% of Prevad through their grantor trusts, the RP Investment Trust and the JL Investment Trust, respectively. In September 1999, Prevad became the sole owner of Presidio, and Prevad was transferred to Norwegian ownership.

---

[1] The following offers a summary of Robert Pfaff's activities. In the legal analysis, below, these activities are discussed in greater detail. Robert Pfaff's partners in the Presidio entities, John Larson & David Amir Makov, also substantially participated in the development and promotion of the BLIPS and/or FLIP/OPIS tax shelters. However, the following focuses solely on Pfaff's involvement.
[2] Exhibit 1.
[3] <u>U.S. v. Pfaff</u>, 2010 U.S. App. LEXIS 17914 (2010 2nd Cir.).
[4] A4:1, p. 65.
[5] A3:1, p. 33; A3:10, p. 54; A3:12, p. 56.
[6] Id.
[7] A3:5, p. 37.
[8] A3:18, p. 58.

**EXHIBIT**
**2**

### ii.      Presidio Growth LLC

Presidio Growth LLC (hereinafter "PG") was organized as a Delaware LLC on July 16, 1999. On July 30, 1999, PG registered to conduct business in Colorado. On August 2, 1999, PG registered to conduct business in California. Hayes Street Management, Inc., later known as HSM Industries, Inc. (hereinafter referred to collectively as "HSM Ind. Inc.") held an ownership interest in PG between 70-85%. The balance of PG was owned by Norwood. In the first half of 2000, HSM Ind. Inc. increased its ownership interest in PG from 70% to 85%. On or about February 11, 2000, HSM Ind. Inc. transferred its ownership in PG to HSM Growth Holdings, Inc.

Pfaff held indirect ownership of PG through several entities. As discussed above, Pfaff held a 20% ownership interest in Norwood. Pfaff was also an officer and shareholder of HSM Ind. Inc. at the time that it obtained an ownership interest in PG.

### iii.     Other Presidio Entities

From 1997 to 2002, Pfaff participated in the formation of more than forty-five business entities to promote tax shelter strategies, serve as holding companies, and perform other functions. The entities are collectively referred to in this report as "Presidio". From mid-1997 through September 1999, Pfaff organized, managed, and sold FLIP/OPIS transactions while at KPMG and through the Presidio entities. See infra, Law & Analysis, III.B. From early 1999 to mid-2000, Pfaff organized, managed, and sold BLIPS transactions through the Presidio entities. See infra, Law & Analysis, III.C.

## II.    The Transactions
### A.     Notice 2001-45 Transactions (hereinafter "FLIP/OPIS")
#### i.      Internal Revenue Service Guidance

The IRS issued Notice 2001-45, 2001-33 I.R.B. 129 on July 26, 2001. The Notice stated that the losses resulting from basis shifting transactions, like the transactions Pfaff promoted, would be disallowed.[9]

On December 21, 2001, the IRS issued Announcement 2002-2 "Disclosure Initiative for Certain Transactions Resulting in Waiver of Certain Penalties under Section 6662 of the Internal Revenue Code." 2002-2 I.R.B. 304 (hereinafter "Announcement 2002-2").[10] Announcement 2002-2 provided that if an investor disclosed participation in any transaction that may warrant an accuracy-related penalty under I.R.C. § 6662, the disclosure would entitle the investor to a waiver of the penalty on the disclosed transaction. The disclosure had to be made prior to April 23, 2002 to obtain the waiver. Numerous investors in transactions promoted by Pfaff filed Announcement 2002-2 disclosures. The investors identified the transactions they participated in as Notice 2001-45 transactions, and identified one or more of the Presidio entities as facilitating or acting as the investment advisor in the transaction.

The Service further mandated the consistent treatment of the Notice 2001-45 transactions as an income tax examination issue requiring disallowance of losses in a Coordinated Issue Paper (CIP) effective December 3, 2002.[11]

#### ii.     The FLIP/OPIS Transactions at Issue

The FLIP/OPIS transactions at issue were marketed to high net worth individuals with significant gains from the sale of stock of privately held companies or other assets. A complete list of all the FLIP/OPIS transactions promoted by Pfaff is attached as Exhibit 8. On June 30, 2003 Exam issued a Promoter Examination Letter to Pfaff.[12] The letter identified sixty-one FLIP/OPIS transactions promoted by Pfaff, which are the subject of this report.

---

[9] Exhibit 2.
[10] Exhibit 3.
[11] Exhibit 4.
[12] Exhibit 10.

### iii.    Description of a Model FLIP/OPIS Transaction

The FLIP/OPIS transactions at issue generally involved a planned series of steps that purportedly generated capital losses to offset capital gains. The steps were as follows:

1. Investor purchases shares of Foreign Bank stock for $5X on the open market.

2. Investor contributes $4X to Foreign Corporation in exchange for Foreign Corporation warrants which, if exercised, would give Investor greater than 50 percent stock ownership interest in Foreign Corporation. All outstanding Foreign Corporation stock is owned by Foreign Parent. Neither Foreign Corporation nor Foreign Parent is subject to U.S. income taxation. Foreign Corporation and Foreign Parent are newly formed. The Foreign Corporation may put the warrants to Foreign Parent or Foreign Corporation.

3. Foreign Corporation borrows approximately $100X from Foreign Bank and uses the proceeds for a market purchase of R shares of Foreign Bank stock. The stock serves as collateral/security for the Foreign Bank loan.

4. Foreign Bank redeems the R shares of Foreign Bank stock held by Foreign Corporation (Foreign Corporation uses the redemption proceeds toward repayment of the Foreign Bank loan), and Investor simultaneously makes a market purchase of out-of-the-money options to acquire R shares of Foreign Bank stock for $1X.

5. Investor later sells most of its directly-held Foreign Bank stock, as well as its options to acquire Foreign Bank stock, recognizing significant capital losses (in the order of $100X).

6. Sometime after step (4), Investor disposes of its Foreign Corporation warrants (typically putting them to Foreign Parent or Foreign Corporation). Investor pays promoter an "investment" fee for arranging the Transaction.

The promoters and investors assert that under I.R.C. §§ 302 and 318, when the Foreign Bank redeems Foreign Corporation's Foreign Bank stock, the Investor's basis in its directly-held Foreign Bank stock (and options) are increased by the amount of Foreign Corporation's basis ($100X) in the Foreign Bank stock redeemed. Thus, Investor's later sale of Foreign Bank stock/options generates a substantial loss (generally equal to the amount of the shifted basis). The substantial losses were created to offset the investor's anticipated capital gains.

### iv.    Pfaff's Involvement with the FLIP/OPIS Transactions at Issue

Pfaff participated in the organization of the FLIP/OPIS transactions at issue. He worked on the development of essential elements of FLIP/OPIS , including authoring opinion letters on the validity of the transaction. All features of the FLIP product were cleared and vetted with Pfaff, and he was a principal member of the working group that developed OPIS. Before leaving KPMG, Pfaff authored a memo that described the future working relationship between Presidio and KPMG in marketing tax advantaged products, including the FLIP/OPIS transactions. Pfaff also had strong relationships with the parties involved in implementing FLIP/OPIS, including KPMG officials and the non-resident aliens that participated in the transactions. Pfaff's relationships were invaluable in pushing FLIP/OPIS toward execution. See infra, Law & Analysis, III.B.i.a.

Pfaff participated in the management of the FLIP/OPIS transactions at issue. Pfaff managed Presidio employees with respect to the implementation of the FLIP/OPIS transactions, including the opening of bank accounts, and transfer of funds. Pfaff also engaged KPMG to provide services to Presidio with respect to the FLIP/OPIS transactions at issue. See infra, Law & Analysis, III.B.i.b.

Pfaff participated in the sale and marketing of the FLIP/OPIS transactions at issue. Pfaff prepared and circulated a memo describing how KPMG could sell the FLIP/OPIS shelters with the assistance of Presidio acting as an investment advisor. See infra, Law & Analysis, III.B.i.c.

B.   **Notice 2000-44 Transactions (hereinafter "BLIPS Transactions")**
 i.      **Internal Revenue Service Guidance**

On August 11, 2000, the Internal Revenue Service issued Notice 2000-44, 2000-2 CB 255, "Tax Avoidance Using Artificially High Basis". In Notice 2000-44, the Service stated that the losses resulting from the inflated basis in transactions covered by the Notice will be disallowed.[13]

On December 21, 2001, the IRS issued Announcement 2002-2 "Disclosure Initiative for Certain Transactions Resulting in Waiver of Certain Penalties under Section 6662 of the Internal Revenue Code." 2002-2 I.R.B. 304 (hereinafter "Announcement 2002-2").[14] Announcement 2002-2 provided that if an investor disclosed participation in any transaction that may warrant an accuracy-related penalty under I.R.C § 6662, the disclosure would entitle the investor to a waiver of the penalty on the disclosed transaction. The disclosure had to be made prior to April 23, 2002 to obtain the waiver. Numerous investors in transactions promoted by Pfaff filed Announcement 2002-2 disclosures. The investors identified the transactions they participated in as Notice 2000-44 transactions, and identified one or more of the Presidio entities as facilitating or acting as the investment advisor in the transaction.

 ii.      **The BLIPS Transactions at Issue**

The BLIPS transactions at issue were marketed to high net worth individuals with significant capital or ordinary gains from the sale of stock of privately held companies or other assets. A complete list of all the BLIPS transactions promoted by Pfaff is attached as Exhibit 5. On June 30, 2003 the Service issued a Promoter Examination Letter to Pfaff.[15] The letter identifies investors who participated in the BLIPS transactions which are the subject of this report.

 iii.      **Description of a Model Transaction**
 a.      **Notice 2000-44 Transactions in General**

A transaction covered by Notice 2000-44 typically required a taxpayer to borrow a loan at an inflated interest rate, a limited liability company (LLC)[16] to subsequently assume that indebtedness, and a planned series of steps that generated non-economic capital or ordinary losses to offset these gains. Generally, the steps were as follows:

1. The investor receives $3,000X in cash from a lender under a loan agreement that provides for an inflated stated interest rate and a stated principal amount of only $2,000X.

2. The taxpayer contributes the $3,000X to a partnership, and the partnership assumes the indebtedness.

3. The partnership thereafter engages in investment activities.

4. At a later time, the taxpayer sells the partnership interest or withdraws from it.

The taxpayer claims that only the stated principal amount of the indebtedness, $2,000X in this example, is considered a liability assumed by the partnership. This assumed liability is treated as a distribution of money to the taxpayer that reduces the basis of the taxpayer's partnership interest under I.R.C. § 752. Therefore, disregarding any additional amounts the taxpayer may contribute to the partnership, transaction costs, and any income realized or expenses incurred at the partnership level, the taxpayer purports to have a basis in the partnership interest equal to the excess of the cash contributed over the stated principal amount of the indebtedness. The taxpayer makes this claim even though their net economic outlay to acquire the partnership interest and the value of the partnership interest are nominal or zero.

---

[13] Exhibit 6.
[14] Exhibit 3.
[15] Exhibit 10.
[16] The LLC elects to be treated as a partnership.

In this example, the taxpayer purports to have a basis in the partnership interest of $1,000X (the excess of the cash contributed ($3,000X) over the stated principal amount of the indebtedness ($2,000X)). On disposition of the partnership interest, the taxpayer claims a tax loss with respect to that basis amount, even though the taxpayer incurred no corresponding economic loss.[17]

### b.  BLIPS Transactions in General

The BLIPS transactions promoted by Pfaff are Notice 2000-44 transactions. In a typical BLIPS transaction, a Strategic Investment Fund, LLC (SIF) was formed. The SIF was owned by the investor's single member LLC ("Ventures LLC") as a 90% Class A member, Presidio Resources as a 9% Class B member, and Presidio Growth, LLC as a Managing member holding a 1% interest.

The purported investment strategy had three phases. Phase I was 60 days long with lower-risk investments; Phase II was 120 days long with increased-risk investments; Phase III was 6.5 years long with even greater-risk investments. De minimis foreign currency trading took place during the first sixty days of the strategy. Investors had 60 day intervals in which to withdraw the Ventures LLC from the SIF. All but one of the 184 investors submitted a notice of withdrawal in time to withdraw by day 60. The one investor who did not withdraw by day 60 submitted a notice of withdrawal before day 120. In the majority of BLIPS transactions, the partnerships dissolved after approximately 60 days. After the SIF distributed all the remaining capital accounts to the members, it dissolved.

In each BLIPS transaction, the loan proceeds and premium were placed into synthetic U.S. dollar deposits. A deposit is a U.S. dollar synthetic deposit when the net effect of the deposit is the same as if the loan proceeds and premium were left on deposit in a U.S. dollar account. The BLIPS loan proceeds and premium, along with earned interest, were generally rolled into Euros and then converted back to US dollars.

The loan proceeds and premium were never used for the de minimis foreign currency trades that took place. For each BLIPS shelter, the investor made an "equity" deposit of approximately 7% of the loan premium or the loss that they wanted to generate.[18] This seven percent was used to pay fees and to cover the de minimis foreign currency trades.[19]

At the end of 60 days, Ventures LLC would withdraw from the SIF. The SIF would then either (i) reject the application for withdrawal and exercise its right to dissolve the SIF or (ii) accept the withdrawal and continue to operate. Typically the day after the Class A member (Ventures LLC) exited, the loan was paid off and the remaining capital distributed to the Class B member (Presidio Resources) and the Managing Member (Presidio Growth, LLC).

Ventures LLC received the distributed assets before SIF paid off the loan. The SIF usually paid off the loan within two days of the distribution to Ventures LLC. The remaining capital account was then paid out to the Presidio Resources and Presidio Growth, LLC. Ventures LLC would then allocate its remaining basis in the SIF to the assets distributed. The inflated outside basis generates a tax loss used to offset other taxable income or gain.

### iv.  Pfaff's Involvement with the BLIPS Transactions at Issue

Pfaff participated in the organization of the BLIPS transactions at issue. He developed essential elements of the BLIPS transaction, including working on the 60 day investor exit from the transaction and the business rationale for the premium loan. Pfaff also contacted Hypo Vereins Bank to be a lender for the BLIPS transactions, negotiating the terms of the loans and setting up a test transaction. Pfaff also had strong relationships with the parties involved in implementing BLIPS, including KPMG officials that were essential to the transaction. Pfaff's relationships were invaluable in pushing BLIPS toward execution. See infra, Law & Analysis, III.C.i.a.

---

[17] Exhibit 6.
[18] A2:5, p. 32.
[19] Exhibit 20.

Pfaff participated in the management of the BLIPS transactions at issue. Pfaff managed Presidio employees with respect to the implementation of the FLIP/OPIS transactions, including the opening of bank accounts, and transfer of funds. Pfaff also recruited David Amir Makov to join Presidio to participate in the BLIPS transactions. See infra, Law & Analysis, III.C.i.b.

Pfaff participated in the sale and marketing of the BLIPS transactions at issue. He participated in sales presentations to BLIPS clients. See infra, Law & Analysis, III.C.i.c.

### III.  Failure to Register the Transactions at Issue

The Service has no record that any of the FLIP/OPIS or BLIPS transactions at issue were registered as tax shelters.

### IV.  U.S. Senate Permanent Subcommittee on Investigations

In 2002, the U.S. Senate Permanent Subcommittee on Investigations of the Committee on Governmental Affairs (hereinafter "PSI") initiated an in-depth investigation of the U.S. tax shelter industry. It focused on four tax shelters, including FLIP/OPIS, and BLIPS. PSI held public hearings on November 18, 2003 and November 20, 2003. During these hearings, PSI interviewed several of the principals in tax shelter promotions, including Larson[20].

PSI published a report of its findings entitled "U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial Professionals – Four KPMG Case Studies: FLIP, OPIS, BLIPS and SC2" in late 2003 (hereinafter "PSI Report").[21] PSI also published four volumes, as part of the public record, entitled: "U.S. Tax Shelter Industry: The Role of Accountants, Lawyers, and Financial Professionals – Hearings before the Permanent Subcommittee on Investigations of the Committee on Governmental Affairs United States Senate" (hereinafter "Hearing Report").[22] The Hearing Report contains transcripts of testimony before PSI, prepared statements of witnesses, summaries of testimony, documents, and the findings of the Subcommittee. PSI issued its final report (Final Report) on February 8, 2005.

This report references evidence found in both the PSI and Hearing Reports.

### LAW &ANALYSIS:

### I.      Overview

I.R.C. § 6707 imposes a penalty when a "person" who is required to register a tax shelter pursuant to I.R.C. § 6111 fails to register the shelter. I.R.C. § 6111 and the regulations thereunder require registration of a transaction where (i) the subject transaction is a "tax shelter" and (ii) the person failing to register is a "tax shelter organizer".

The term "person," as used in the subchapter of the I.R.C. that encompasses § 6707, is defined in § 6671(b). Specifically, I.R.C. § 6671(b) provides that a "person" includes an "officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member is under a duty to perform the act in respect of which the violation occurs."

The following section determines that (i) the FLIP/OPIS and BLIPS transactions were "tax shelters", (ii) that Pfaff is a "tax shelter organizer" with respect to both the FLIP/OPIS and BLIPS transactions, (iii) Pfaff has not shown that he meets any of the exceptions to the registration requirement, and (iv) none of the FLIP/OPIS or BLIPS transactions at issue were registered pursuant to I.R.C. § 6111.

Therefore, Pfaff is liable for penalties under I.R.C. § 6707 for failure to register the FLIP/OPIS and BLIPS transactions at issue.

---

[20] See Hearing Report, Vol. 1.
[21] The report can be found on the Senate website at http://hsgac.senate.gov.
[22] The Hearing Report can be found at the San Francisco Public Library website at http://sfpl.org//.

## II.     The Tax Shelters at Issue
### A.     "Tax Shelters" for Purposes of Treas. Reg. § 301.6111-1T

For Purposes of I.R.C. § 6111, a "tax shelter" is an investment that (i) has a tax shelter ratio of greater than 2:1 and (ii) is a substantial investment.[23]

### i.     Tax Shelter Ratio

To be considered a tax shelter, an investment must have a tax shelter ratio of greater than 2:1 as of the close of any of the first 5 years.[24]  The tax shelter ratio is, with respect to any year, the ratio of the aggregate amount of the deductions and 350 percent of the credits to the investment base for such investor as of the close of such year[25]:

$$\text{Tax Shelter Ratio} = \frac{\text{(Aggregate amount of deductions + 350\% credits)}}{\text{Investment base}}$$

The ratio requirement is satisfied if the requirement is met under any type of financing arrangement that is or will be represented as available to investors.[26]

#### a.     Tax Shelter Ratio Numerator

The numerator of the tax shelter ratio is the aggregate amount of deductions, plus 350% of the credits that are or represented as potentially allowable during the year.[27]  The "amount of deductions" includes the amount of gross deductions and other similar benefits that are potentially allowable with respect to the investment, not to be offset by any gross income derived or potentially derived from the investment.[28]  "Credits" are the amount of credits potentially allowable with respect to the investment, not to be offset by any potential tax liability resulting from the investment or possible recapture.[29]

A deduction or credit is "represented" if any statement is made in connection with offering the investment indicating that a deduction or credit is available.[30]  The statement can be oral or written, and includes general representations.[31]  If an amount is specifically represented, the amount will be reasonably estimated based on representations of economic value.[32]

#### b.     Tax Shelter Ratio Denominator

The denominator of the tax shelter ratio is the "investment base" of the investment.[33]  The investment base is the amount of money and the adjusted basis of other property unconditionally required to be contributed or paid by the investor to the tax shelter as of the close of the year.[34]

---

[23] Treas. Reg. § 301.6111-1T, Q&A-4.
[24] Id.
[25] Treas. Reg. § 301.6111-1T, Q&A-5.  While the statute defines the tax shelter ratio with respect to 350 percent of the credits, the temporary regulation defines the tax shelter ratio with respect to 200 percent of the credits.  See Treas. Reg. § 301.6111-1T, Q&A-5.  The temporary regulation was originally promulgated in 1984.  See T.D. 7964, 1984-2 C.B. 263.  Subsequent to the promulgation of the regulation, Congress amended the definition of "tax shelter ratio" and changed the percentage from 200 to 350.  Tax Reform Act of 1986, Pub. L. No. 99-514, § 1531(a), 100 Stat. 2085 (1986).  The amendment was made effective to any tax shelter interests that are first offered for sale after December 31, 1986.
[26] Treas. Reg. § 301.6111-1T, Q&A-5, Q&A-16.
[27] Treas. Reg. § 301.6111-1T, Q&A-5.
[28] Treas. Reg. § 301.6111-1T, Q&A-6.
[29] Id.
[30] Treas. Reg. § 301.6111-1T, Q&A-8.
[31] Id.
[32] Treas. Reg. § 301.6111-1T, Q&A-9.
[33] Treas. Reg. § 301.6111-1T, Q&A-13.
[34] IRC § 6111(c)(3)(A); Treas. Reg. § 301.6111-1T, Q&A-13.

The investment base excludes:

1. Amounts borrowed by the investor from any person participating in the investment – unless unconditionally required to be repaid by end of year;

2. Amounts borrowed by the investor if the loan is arranged by related person – unless unconditionally required to be repaid by the end of the year;

3. Amounts borrowed, directly or indirectly, from a lender outside the U.S. of which the related person has reason to know;

4. Amounts to be held for benefit of investors in cash, equivalents or marketable securities;

5. Distributions made without regard to the income of the tax shelter, to the extent distributions exceed amount to be held as cash, equivalent, or securities at the end of the year.[35]

### ii.  Substantial Investment

To be considered a tax shelter, an investment must be a "substantial investment."[36] An investment is a substantial investment if (i) the aggregate amount which may be offered for sale to all investors exceeds $250,000 and (ii) there are expected to be 5 or more investors. [37]

The aggregate amount offered for sale is the aggregate amount to be received from the sale of interest in the investment. The amount includes cash, the fair market value of property contributed, and the principal amount of all indebtedness received in exchange for interests in the investment, regardless of whether the proceeds of the indebtedness are included in the investment base.[38]

Similar investments will be aggregated if they are offered by the same or related persons. Investments are similar if they involve similar principal assets and similar plans or arrangements.[39]

### B.  The FLIP/OPIS Transactions are Tax Shelters within the Meaning of Treas. Reg. § 301.6111-1T
### i.   Tax Shelter Ratio

The FLIP/OPIS transactions allegedly created a loss for the participating investors. A series of steps artificially increased the basis of investor held stock, which the investor subsequently sold for a loss. The investor reported the loss on their federal income tax return, which in turn offset other gains.

For purposes of the tax shelter ratio, the "amount of deductions" includes the bases of the stock, the stock option and swaps acquired in the FLIP/OPIS transactions. A deduction decreases taxable income. The basis of an asset, when sold, can also cause a decrease in taxable income. When the asset's basis exceeds the sale price, a loss arises that may offset other gains. Because the loss generated from a high basis asset reduces taxable income, the basis can provide tax benefits similar to ordinary deductions, i.e. reduction in taxable income. The FLIP/OPIS transactions manipulated the bases of assets to generate losses from asset sales. Thus, the bases of the assets in the FLIP/OPIS transactions are treated as deductions and should be included in the aggregate deductions component of the numerator.

---

[35] Treas. Reg. § 301.6111-1T, Q&A-14.
[36] I.R.C. § 6111(c)(1)(B)(iii); Treas. Reg. § 301.6111-1T, Q&A-4.
[37] I.R.C. § 6111(c)(4); Treas. Reg. § 301.6111-1T, Q&A-21.
[38] Treas. Reg. § 301.6111-1T, Q&A-21.
[39] Treas. Reg. § 301.6111-1T, Q&A-22.

a.    **FLIP/OPIS Tax Shelter Ratio Sample Analysis**

The following example illustrates the Tax Shelter Ratio Analysis for the FLIP/OPIS transactions.  The tax shelter ratio for each FLIP/OPIS transaction at issue is included in Exhibit 8.  Every FLIP/OPIS transaction at issue had a tax benefit ratio greater than 2:1.

The 61 FLIP/OPIS transactions were sold between 1997 and 1999 and each underlying transaction was generally completed within sixty days.  Since each FLIP/OPIS transaction met the 2:1 ratio by the end of the close of one of the five years after the transaction was entered into, the tax benefit ratio required under I.R.C. § 6111(c)(1)(A) is met.[40]

1.    **Dennis M. Crumpler (hereinafter "Crumpler") – Laurel Street LLC**

On September 29, 1998, Dennis M. Crumpler invested $1,340,000 in a swap transaction with Laurel Street LLC, purchased a call option from Laurel Street LLC on its 50% interest in Laurel Street, Ltd. for $60,000, and purchased 17,720 shares of Deutsche Bank (hereinafter "DB") stock for $1,000,726.

On November 20, 1998 Crumpler purchased Over-the-Counter call options on 97,875 shares of DB stock from DB for $245,524.  According to KPMG, Crumpler incurred $210,920 in fees to implement the transaction.[41]

The numerator in the Crumpler transaction includes the purchase of stock, options, the purported use of a swap, and fees.  The calculation for the numerator is as follows:

| | |
|---|---:|
| Bases of stock, option, and swap | $23,160,945 |
| Fees | 210,920 |
| Proceeds | (1,918,941) |
| Total – Aggregate Amount of Deductions | $21,452,924 |

The denominator in the Crumpler transaction is comprised of the following components, which are listed in the tax shelter ratio and penalty computation spreadsheet:[42]

| | |
|---|---:|
| Purchase of Swap with Laurel Street LLC (09/29/98) | $1,340,000 |
| Purchase of Call Option from Laurel Street LLC on its 50% interest in Laurel Street Ltd. (09/29/98) | 60,000 |
| Purchase of 17,720 Deutsche Bank (DB) Stock  (09/29/98) | 1,000,726 |
| Purchase of Over-the-Counter call Options on 97,875 shares of DB stock from DB (11/20/98) | 245,524 |
| Fees | 210,920 |
| Total – Investment | $2,857,170 |
| | |
| DB Stock Proceeds | $1,022,013 |
| OTC Options Proceeds | $99,861 |
| Swap Proceeds | 743,543 |
| Call Option Proceeds | 53,524 |
| Total – Exclusions | $1,918,941 |
| | |
| Total Investment | $2,857,170 |
| Total Exclusions | $1,918,941 |

---

[40] Exhibit 8.
[41] Exhibit 7.
[42] Exhibits 7, 8.

Total – Net Investor Contribution                                   $  938,229

The Crumpler ratio calculation is as follows:[43]

$$\text{Ratio} = \frac{(\text{Aggregate amount of deductions} + 350\% \text{ credits})}{\text{Investment base}} = \frac{21,452,924}{938,229} = 22.87{:}1^{[44]}$$

Crumpler completed the underlying transaction in less than two months.  Assuming the FLIP/OPIS transaction was offered for sale in the same year the transaction occurred, the 2:1 ratio was met as of the close of the first year after Presidio offered the transaction for sale.  Since the ratio was met in the first year of the first five years ending after the date on which such investment is offered for sale, the time requirement of I.R.C. § 6111(c)(1)(A) is also met.  Thus, the Crumpler transaction meets tax shelter ratio test.

    ii.  **Substantial Investment**
      a.  **Aggregate Amount Offered for Sale**

The total amount invested in the sixty-one FLIP/OPIS transactions is approximately 7% of the amount of the basis shifts.[45]  The total basis shift amount in the transactions equals approximately $1.799 billion as determined from an investor list provided by Presidio on July 31, 2003.  Therefore, the total amount invested equals approximately $125,930,000 ($1.799 billion x 7%).

In the alternative, the amount offered for sale can be determined by the amount of the investment base.  The total investment base for the sixty-one transactions equals $162,177,883.

In either scenario, the aggregate amount offered for sale substantially exceeds $250,000.  Therefore, the aggregate amount requirement is met.

      b.  **Five or More Investors**

The Service has identified 61 FLIP/OPIS transactions at issue.  Therefore, the requirement for the expectation of 5 or more investors is met.

    iii.  **Conclusion**

The FLIP/OPIS transactions at issue, promoted by Pfaff, each generated a tax shelter benefit ratio of greater than 2:1 and are substantial investments as defined by Treas. Reg. § 301.6111-1T.  Therefore, the FLIP/OPIS transactions at issue are tax shelters for the purpose of I.R.C. § 6111.

    C.  **The BLIPS Transactions are Tax Shelters within the Meaning of Treas. Reg. § 301.6111-1T**
     i.  **Tax Shelter Ratio**

The BLIPS transactions allegedly created a loss for the participating investors.  A series of steps artificially increased the outside basis of the investor in the cash, stock, and/or Euros (hereinafter "assets") distributed in the transaction.  When the investor sold the assets the investor would report the loss on their federal tax returns, offsetting other gains.  The BLIPS transaction was also used to create an artificially high outside basis in the investors' partnership interest.  Based on the inflated basis for the partial partnership interest, the investor would report a loss on his tax return for that year.

For purposes of the BLIPS tax shelter ratio, the "amount of deductions" includes the loan premium, the investor's cash contribution, interest and dividends treated as additional cash contribution and additional fees paid.  In the

---

[43] Exhibits 7, 8.
[44] Exhibit 8.
[45] Exhibit 9, Oct. Transcript pp. 115-116.

BLIPS transactions, all of the above items purportedly increased the basis in assets distributed when the investor withdrew from the partnership. In some transactions, when the investor withdrew from the partnership, the BLIPS transaction was terminated and the loss was triggered. In other instances the purported loss was triggered later, when the investors sold the distributed assets. Many investors sold distributed assets over a 3-4 year period and generated losses in those years.

A deduction decreases taxable income. The basis of an asset, when sold, can also cause a decrease in taxable income. When the asset's basis exceeds the sale price, a loss arises that may offset other gains. Because the loss generated from a high basis asset reduces taxable income, the basis can provide tax benefits similar to ordinary deductions, i.e. reduction in taxable income. The BLIPS transactions manipulated the bases of assets to generate losses from asset sales. Thus, the bases of the assets in the BLIPS transactions are treated as deductions and should be included in the aggregate deductions component of the numerator.

### a.    BLIPS Tax Shelter Ratio Sample Analysis

The following two examples illustrate the tax shelter ratio analysis for the BLIPS transactions. The tax shelter ratio for each BLIPS transaction at issue is included in Exhibit 5. Every BLIPS transaction at issue had a tax benefit ratio greater than 2:1.

The 184 BLIPS transactions at issue were sold between 1999 and 2000, and each underlying transaction was generally completed within approximately seventy-two days. Since each BLIPS transaction at issue met the 2:1 ratio by the end of the close of one of the five years after the transaction was entered into, the tax benefit ratio required under I.R.C. § 6111(c)(1)(A) is met.[46]

### 1.    Joseph Nacchio (hereinafter "Nacchio") – Grays Strategic Investment Fund (hereinafter "Grays SIF")

This section computes the tax benefit ratio of the Nacchio BLIPS transaction for the 1999 tax year.

The numerator in the Nacchio transaction is equal to the total amount of the purported basis in the assets (the basis allocated to the assets as of the date of withdrawal from the partnership) plus the amount of investment losses deducted. The calculation for the numerator is as follows:[47]

| | |
|---|---|
| Basis of property Distributed | $20,975,142 |
| Loss from Investment Fund | 351,575 |
| Total – Aggregate Amount of Deductions | $21,326,717 |

The aggregate amount of deductions is comprised of the following components, which are listed in the tax shelter ratio and penalty computation spreadsheet:[48]

| | |
|---|---|
| Loan Premium | $20,000,000 |
| Cash Contribution | 1,400,000 |
| Interest/Dividend Income (Treated as additional cash contribution) | 63,312 |
| KPMG, GDC and BW Fees | 322,500 |
| Less:  Cash Distributed (Treated as a reduction of cash contrib.) | (459,095) |
| Total - Aggregate amount of deductions | $21,326,717 |

The denominator in the Nacchio transaction is computed by adding all of the cash contributions to the transaction, less the distributions to the investor. The calculation for the denominator is as follows[49]:

| | |
|---|---|
| Capital Contribution (from Schedule K-1) | $1,463,312 |

---

[46] Exhibit 5.
[47] Exhibit 11.
[48] Exhibits 5, 11.
[49] Id.

| | |
|---|---:|
| Distributions (from Schedule K-1) | (498,492) |
| Additional Prof. Fees Paid (Computation workpaper) | 322,500 |
| Total – Net Investor Contribution | $1,287,320 |

The Nacchio ratio calculation is as follows:[50]

$$\text{Nacchio Ratio} = \frac{\text{(Aggregate deductions} + 350\% \text{ credits)}}{\text{Investment base}} = \frac{21,326,717}{1,287,320} = 16.57 \text{ to } 1$$

The Nacchio transaction has a tax shelter ratio of 16.57 to 1, greater than the 2 to 1 ratio required by Treas. Reg. § 6111-1T. Therefore, the Nacchio BLIPS transaction meets the tax shelter ratio test.

**2.      David Shimmon (hereinafter "Shimmon") – Belford Strategic Investment Fund (hereinafter "Belford SIF")**

This section computes the tax benefit ratio of the Shimmon BLIPS transaction for the 1999 tax year.

The numerator in the Shimmon transaction is equal to the total amount of the purported basis in the assets (the basis allocated to the assets as of the date of withdrawal from the partnership) plus the amount of investment losses deducted. The calculation for the numerator is as follows:[51]

| | |
|---|---:|
| Basis of property Distributed | $83,862,107 |
| Loss from Investment Fund | 1,415,412 |
| Total – Aggregate Amount of Deductions | $85,277,519 |

The aggregate amount of deductions is comprised of the following components, which are listed in the tax shelter ratio and penalty computation spreadsheet:[52]

| | |
|---|---:|
| Loan Premium | $80,000,000 |
| Cash Contribution | 5,600,000 |
| Interest/Dividend Income (treated as additional cash contrib.) | 250,273 |
| Less:  Cash Distributed (treated as a reduction of cash contrib.) | (572,754) |
| Total - Aggregate amount of deductions | $85,277,519 |

The aggregate amount of deductions is comprised of the following components, which are listed in the tax shelter ratio and penalty computation spreadsheet:[53]

| | |
|---|---:|
| Capital Contribution (from Schedule K-1) | $5,850,272 |
| Distributions (from Schedule K-1) | (1,743,019) |
| Additional Prof. Fees Paid (Computation workpaper) | 1,000,000 |
| Total – Net Investor Contribution | $5,107,253 |

The Shimmon ratio calculation is as follows:[54]

$$\text{Shimmon Ratio} = \frac{\text{(Aggregate deductions} + 350\% \text{ credits)}}{\text{Investment base}} = \frac{85,277,519}{5,107,253} = 16.70 \text{ to } 1$$

The Shimmon transaction has a tax shelter ratio of 16.70 to 1, greater than the 2 to 1 ratio required by Treas. Reg. § 6111-1T. Therefore, the Shimmon BLIPS transaction meets the tax shelter ratio test.

---

[50] Id.
[51] Exhibit 12.
[52] Exhibits 5, 12.
[53] Id.
[54] Id.

ii.     **Substantial Investment**
a.     **Aggregate Amount**

The total amount invested in the 184 BLIPS transactions at issue equals approximately 7% of the losses taken. Larson testified before the Senate Committee that the investor's capital contribution to the BLIPS transaction was seven percent of the loss to be generated.[55] The total losses taken in the transactions equals approximately $4.6 billion as determined from the investor list provided by Presidio on July 31, 2003. Therefore, the total amount invested equals approximately $322,000,000 ($4.6 billion x 7%).

In the alternative, the amount offered for sale can be determined by the amount of the investment base. The total investment base for the 184 transactions equals $297,894,546.[56]

In either scenario, the aggregate amount offered for sale substantially exceeds $250,000. Therefore, the aggregate amount requirement is met.

b.     **Five or More Investors**

The Service has identified 184 BLIPS transactions at issue, 137 implemented in 1999 and 47 implemented in 2000. Therefore, the requirement for an expectation of 5 or more investors is met.

c.     **Conclusion**

Since the total amount invested in the BLIPS transactions at issue is greater than $250,000, and Pfaff had an expectation of more than 5 investors, the BLIPS transactions are substantial investments as defined by Treas. Reg. § 301.6111-1T.

iii.     **Conclusion**

The BLIPS transactions at issue, promoted by Pfaff, each generated a tax shelter benefit ratio of greater than 2:1 and are substantial investments as defined by Treas. Reg. § 301.6111-1T. Therefore, the BLIPS transactions at issue are tax shelters for the purpose of I.R.C. § 6111.

III.     **Pfaff is a Person Required to Register the Tax Shelters**
A.     **General Requirements**

A tax shelter organizer must register a tax shelter.[57] A tax shelter organizer is the person principally responsible for organizing the tax shelter, any other person who participated in the organization of the tax shelter, or any person participating in the sale or management of the investment at a time when the tax shelter was not registered with the Secretary.[58]

If a person principally responsible for organizing a shelter has not registered the shelter by the day on which the shelter is required to be registered, any other person who participated in the organization of the shelter will be treated as a tax shelter organizer. If neither a person principally responsible for organizing a shelter nor any other person who participated in the organization of the shelter has registered the shelter by the day on which the shelter is required to be registered, any person who participates in the management of the shelter will be treated as a tax shelter organizer. If a person participates in the sale of a tax shelter at a time when the person knows or has reason to know that the shelter is not registered, that person will be treated as a tax shelter organizer.[59]

A person principally responsible for organizing a tax shelter discovers, creates, investigates, or initiates the investment, devises the business or financial plans for the investment, or carries out those plans through negotiations

---

[55] A2:5, p. 32.
[56] Exhibit 5.
[57] I.R.C. § 6111(a).
[58] I.R.C. § 6111(e)(1).
[59] Treas. Reg. § 301.6111-1T, Q&A-26.

or transactions with others.[60] Specific organizational activities include preparation of any document establishing the tax shelter: preparation of a prospectus, offering memorandum, financial statement, or other statement describing the tax shelter; preparation of a tax or other legal opinion relating to the tax shelter; and negotiation or other participation on behalf of the tax shelter in the purchase of any property relating to the tax shelter.[61]

Participation in the management of a tax shelter includes managing the assets of the tax shelter, directing the business activity of the tax shelter, or actively participating in the management of the form of the tax shelter. For example, a general partner who actively manages a partnership or a corporate officer or director, participates in the management of the partnership or corporation.[62]

Where a person markets an investment, the person will be considered a participant in the sale of a tax shelter for purposes of I.R.C. § 6111.[63] Marketing includes "[d]irect contact with a prospective purchaser of an interest, or with a representative or agent of a prospective purchaser, but only if the contact relates to the possible purchase of an interest in the tax shelter" and "[i]nstructing or advising salespersons regarding the tax shelter or sales presentations."[64]

> **B.    Pfaff was the Person Required to Register the FLIP/OPIS Transactions at Issue**
>
> **i.    Pfaff is a Tax Shelter Organizer**
>
> **a.    Pfaff had Principal Responsibility for Organizing the FLIP/OPIS Tax Shelter**

Pfaff investigated, created and initiated the FLIP/OPIS transactions. Pfaff first worked on development of the FLIP Transaction while at KMPG. [65]  During the development process, all features of the FLIP product were vetted and cleared with Pfaff.[66] Pfaff also authored opinion letters on the validity of the FLIP transaction.[67] At KMPG, Pfaff was responsible for bringing KPMG partner Bob Simon up to speed when Simon began working on FLIP transactions.[68] While training Simon, Pfaff stated that he was responsible for devising the FLIP shelter.[69]

Before leaving KPMG, Pfaff circulated a memo laying out a strategy for KMPG to offer "turn key" financial products (hereinafter "Turn Key Memo").[70] The memo details a future strategy for KMPG's Tax Advantaged Tax Practice. The memo also describes in detail the benefits of a relationship between Presidio and KMPG in marketing and implementing the FLIP shelter.

While at Presidio, Pfaff continued to make changes to the FLIP shelter. The changes to FLIP would eventually lead to the OPIS shelter.[71] Pfaff was a member of the working group that developed OPIS. Pfaff met with Simon, throughout October and November of 1997 to develop OPIS. During this time, Pfaff and Simon had numerous meetings and daily phone calls.[72] All features of the OPIS shelter were vetted and cleared with Pfaff.[73]

Pfaff also negotiated the terms of the OPIS financial transactions with Deutsche Bank.[74] In so doing, Pfaff implemented and carried out OPIS transaction through negotiations and transactions with third parties.

KPMG has recognized that it worked closely with Presidio in developing the shelters.[75] As described in Pfaff's Turn Key Memo, the relationship between KPMG and Presidio was essential to creating, developing, and marketing

---

[60] Treas. Reg. § 301.6111-1T, Q&A-27.
[61] Treas. Reg. § 301.6111-1T, Q&A-28.
[62] Treas. Reg. § 301.6111-1T, Q&A-29.
[63] Treas. Reg. § 301.6111-1T, Q&A-31.
[64] Id.
[65] A1:4, p. 24; A3:5, p. 38.
[66] A1:5, p. 25.
[67] A3:5, p. 38.
[68] Id.
[69] Id.
[70] Exhibit 24.
[71] Exhibit 14.
[72] Exhibits 14, 15.
[73] A1:5, p. 25.
[74] A3:2, p. 36.
[75] A1:4–9, p. 24-26.

FLIP/OPIS. Pfaff's relationships with key KPMG personnel were instrumental in enabling FLIP/OPIS to move forward.

As described above, Pfaff worked for KPMG as partner in the Tax Department. Pfaff spent part of his career with KPMG at the organization's office in Paris.[76] While in the Paris office, Pfaff worked with and built a relationship with Jeffrey Stein and Helge Vilhelmsen.[77] Pfaff also had a personal relationship with KMPG partner John Lanning, who was Pfaff's neighbor.[78]

Jeffrey Stein is a former Deputy Chairman of KPMG, former Vice Chairman of KPMG in charge of Tax, and former KPMG tax partner. John Lanning is a former Vice Chairman of KPMG in charge of Tax, and former KPMG tax partner. Pfaff leveraged his previous relationship with Stein to push FLIP/OPIS through the approval process at KPMG.[79] Among other communications, Pfaff sent the Turn Key Memo to Stein and Lanning as an initial step in cultivating the relationship between KPMG and Presidio.[80]

The structure of the FLIP/OPIS shelters relies on the participation of a non-resident alien to be subject to the taxable side of the transaction. Vilhelmsen was primary contact between Presidio and the non-resident aliens who participated and invested in the FLIP/OPIS transactions.[81] In addition to their working relationship, Pfaff and Vilhelmsen had a close personal relationship; Vilhelmsen was godfather to one of Pfaff's children.[82]

Presidio, KPMG, and the non-resident aliens were all essential parties in the creation, implementation, and marketing of FLIP/OPIS. Pfaff's relationship with each party was the glue that held the transactions together. Pfaff himself indicated that his intangible contribution to Presidio was his relationships. Pfaff stated in an interview: "I had the relationships"[83], "I had all these relationships, because I had been a partner there. I was in my 13th year; I'd like to think reasonably well respected and good relationships"[84], "my role . . . was relationships with KPMG"[85], "When Presidio Advisors was formed in September of 1997, the intellectual property in my case would have been my relationships".[86]

Pfaff participated in the investigation, creation, and implementation of the FLIP/OPIS transactions. He was a member of the working group that designed both transactions. Through his Turn Key Memo and relationships, Pfaff spearheaded the partnership between KPMG, Presidio and the non-resident aliens that made the implementation of FLIP/OPIS possible. Therefore, Pfaff had principal responsibility for organizing the FLIP/OPIS shelter under Treas. Reg. § 301.6111-1T. In the alternative, Pfaff participated in the organization of the FLIP/OPIS shelter under Treas. Reg. § 301.6111-1T.

### b.    Pfaff Participated in the Management of the FLIP/OPIS Tax Shelter

Pfaff actively participated in the management of the FLIP/OPIS shelter. He managed employees and entered into agreements on behalf of Presidio. Pfaff was a senior partner of Presidio.[87] In this capacity, he directed employees' activities with respect to the implementation of the FLIP/OPIS transactions.[88] Pfaff visited the San Francisco offices of Presidio at least once per month, and spoke to the senior partner in the San Francisco office, John Larson, daily.[89]

Presidio employees such as Steven Buss reported to the Presidio partners, including Pfaff.[90] These employees executed and facilitated the bank and securities transactions necessary to facilitate the FLIP/OPIS shelters, including

---

[76] A3:1, p. 33; A3:10, p. 54; A3:12, p. 56.
[77] Id.
[78] A3:12, p. 56.
[79] Id.
[80] Exhibit 24.
[81] A3:1, p. 33.
[82] A3:6, p. 44.
[83] A4:4, p. 67.
[84] A4:2, p. 65.
[85] A4:3, p. 67.
[86] A4:2, p. 65.
[87] A3:8, p. 51.
[88] A1:16-18, p. 27.
[89] A3:3, p. 37.
[90] A3:4, p. 37.

assisting investors in the opening of accounts. The employees also coordinated the transfer of funds, purchase of securities, finalization of loans, and sale of securities within the FLIP/OPIS shelters.[91]

Pfaff also worked to cement Presidio's relationship with KPMG with regard to the FLIP/OPIS shelters. Pfaff was responsible for engaging KMPG to provide services to Presidio for the FLIP/OPIS shelters.[92] He also prepared a memo to KMPG regarding ownership of the OPIS transaction documents and "tax technology".[93]

Pfaff managed employees who performed the day to day transactions necessary for the FLIP/OPIS shelter and participated in other management activities. Therefore, Pfaff participated in the management of the FLIP/OPIS shelter, and is a tax shelter organizer for purposes of Treas. Reg. § 301.6111-1T.

### c.   Pfaff Participated in the Sale of the FLIP/OPIS Tax Shelter

Pfaff's Turn Key Memo advised KPMG on how the FLIP/OPIS shelters may be sold with the assistance of an investment advisor.[94] As described above, Pfaff also had a business and personal relationship with Vilhelmsen, the key contact with the non-resident alien investors in the FLIP/OPIS shelters.

Pfaff was involved in developing the sales strategy for the FLIP/OPIS shelters. Therefore, Pfaff participated in the sale of a tax shelter for the purposes of Treas. Reg. § 301.6111-1T.

### ii.   Pfaff Participated in Entrepreneurial Risks

A person who principally organizes, participates in the organization, or participates in the management of a tax shelter , must also either (i) be related to the tax shelter (or any principal organizer of the tax shelter), or (ii) participate in the entrepreneurial risks or benefits of the tax shelter.[95] A person will be considered a participant in the entrepreneurial risks or benefits of a tax shelter if the person's compensation for performing the activities is contingent on any matter relating to the tax shelter, including if the compensation is based in whole or in part upon whether the interests in the tax shelter are actually sold.[96]

The entrepreneurial risk requirement does not apply to persons who participate in the sale of a tax shelter. Treas. Reg. § 301.6111-1T, Q&A 30 discusses entrepreneurial risk. Performance of an act described in Treas. Reg. § 301.6111-1T, Q&A 27 – Q&A 29 will not constitute participation in the organization of a tax shelter unless the person participates in the entrepreneurial risk or benefits of the tax shelter. Participation in the sale of a tax shelter is discussed in Treas. Reg. § 301.6111-1T, Q&A 31. Since participation in a sale is not discussed in Q&As 27-29, the entrepreneurial risk requirement does not apply.

Presidio participated in entrepreneurial benefits of the FLIP/OPIS shelter. For many of the FLIP/OPIS transactions, Presidio's fees equaled a percentage of the amount of the basis shift in the transaction, expressed in the related documents as the notional account value. For example, in the Crumpler transaction, the fee percentage was 0.9%.[97] The amount of fees received by Presidio was computed as a percentage of the amount of the basis shift.[98] Presidio's compensation was contingent on matters relating to the tax shelter.

As described above, Pfaff owned significant portions of the Presidio entities either directly and through ownership of entities which controlled the Presidio entities. Pfaff was compensated through his salary or through the appreciation of his ownership interests. Ninety-five percent of Presidio's revenue came through its work with KMPG on the BLIPS and FLIP/OPIS tax shelters.[99]

---

[91] A1:17-25, p. 27-29.
[92] Exhibit 17.
[93] Exhibit 16.
[94] Exhibit 24.
[95] Treas. Reg. § 301.6111-1T, Q&A-30.
[96] Treas. Reg. § 301.6111-1T, Q&A-30.
[97] Exhibit 13.
[98] A1:26-27, p. 29; Exhibit 9, October Transcript 122.
[99] Hearing Report, Vol. 1, p 228.

### iii.   Conclusion

As described above, Pfaff is principally responsible for organizing the FLIP/OPIS shelter.  Alternatively, Pfaff participated in the organization and management of the FLIP/OPIS shelter at a time when it was not registered. Pfaff also participated in the sale of the FLIP/OPIS shelter .

Pfaff participated in the entrepreneurial risk of the FLIP/OPIS shelter.

Therefore, Pfaff qualifies as a tax shelter organizer of the FLIP/OPIS transaction under I.R.C. § 6111.

### C.   Pfaff was the Person Required to Register the BLIPS Transactions at Issue
#### i.   Pfaff is a Tax Shelter Organizer
##### a.   Pfaff had Principal Responsibility for Organizing the BLIPS Tax Shelter

Pfaff had principal responsibility for organizing the BLIPS shelter.  He worked to develop the structure of the BLIPS transaction.[100]  In addition, Pfaff worked on a plan to push BLIPS investors toward a 60 day exit from the transaction.[101]  Pfaff devised arguments that BLIPS was not a tax shelter, to be used in the event of an IRS audit of a BLIPS investor.[102]  He also worked closely with KMPG, meeting and briefing KPMG representatives on the financing and investment work that Pfaff had done in developing the BLIPS transaction.[103]  Pfaff also reviewed the final draft of the BLIPS opinion letter.[104]

When KPMG voiced concerns regarding the business purpose of the premium loan that was the centerpiece of the BLIPS shelter, Pfaff participated in a conference call to address KMPG's concerns.[105]  Pfaff also dictated key language in a memo prepared by Presidio addressing the business purpose of the premium loan, a key part of the BLIPS shelter.  Portions of the memo dictated by Pfaff include the first paragraph, which states that the BLIPS shelter created a reasonable pre-tax, after-fee profit expectation for the investor. [106]  Pfaff insisted on the inclusion of this paragraph despite concerns that the paragraph was not true.[107]

Pfaff also carried out the BLIPS shelter through negotiations with third parties.  Pfaff reached out to Hypo Vereins Bank (hereinafter "HVB") to bring them in as a lender for BLIPS transactions.[108]  He contacted HVB employee Domenick DeGiorgio, whom Pfaff knew from working together on previous transactions.[109]  Pfaff explained the transaction to DeGiorgio, who set up a formal meeting with other HVB officials.[110]  At the meeting, Pfaff made a formal presentation to the HVB officials, explaining the BLIPS transaction by diagramming it on a white board. Pfaff also explained the type of loan that HVB would need to provide and discussed pricing of the loan.[111]  Once HVB expressed interest in providing financing for BLIPS transactions, Pfaff set up a test BLIPS transaction with HVB.[112]  Pfaff sent HVB a memo detailing the terms for the test transaction.[113]

Pfaff's relationships discussed in Law & Analysis, III.B.a, are also relevant to the BLIPS transaction.  The same partners, including Presidio and KPMG, participated in the BLIPS transactions.  Pfaff's relationships were equally as important to BLIPS as to FLIP/OPIS.

Pfaff participated in the investigation, creation, and implementation of the BLIPS transactions.  Pfaff spearheaded the partnership between KPMG and Presidio that made the implementation of BLIPS possible.  Therefore, Pfaff had

---

[100] A2:1-2, p. 31.
[101] A3:13, p. 57.
[102] A3:14, p. 57.
[103] Exhibit 22.
[104] Exhibit 19.
[105] A3:11, p. 54.
[106] A3:16, p. 58.
[107] A3:16, p. 58.
[108] A3:6, p. 44.
[109] Id.
[110] Id.
[111] Id.
[112] A3:7, p. 50.
[113] Exhibit 21.

principal responsibility for organizing the BLIPS shelter under Treas. Reg. § 301.6111-1T.  In the alternative, Pfaff participated in the organization of the BLIPS shelter under Treas. Reg. § 301.6111-1T.

### b.   Pfaff Participated in the Management of the BLIPS Tax Shelter

Pfaff actively participated in the management of the BLIPS shelter.  He managed employees and entered into agreements on behalf of Presidio.  Pfaff was a senior partner of Presidio.[114]  In this capacity, he directed employees' activities with respect to the implementation of the BLIPS transactions.[115]  Pfaff visited the San Francisco offices of Presidio at least once per month, and spoke to the senior partner in the San Francisco office, John Larson, daily.[116]  Pfaff was involved in recruiting Amir Makov to join Presidio.  During the recruiting process, Pfaff met with Makov to explain the BLIPS transaction and explain the value that Makov would add to Presidio.[117]  Pfaff also arranged for the Holland & Hart law firm to represent Presidio and provide tax opinions on the BLIPS transactions for a set fee.[118]

Presidio employees such as Steven Buss reported to the Presidio partners, including Pfaff.[119]  These employees executed and facilitated the bank and securities transactions necessary to facilitate the BLIPS shelters, including assisting investors in the opening of accounts.  The employees also coordinated the transfer of funds, purchase of securities, finalization of loans, and sale of securities within the BLIPS shelters.[120]

Pfaff managed employees who performed the day to day transactions necessary for the BLIPS shelter and participated in other management activities.  Therefore, Pfaff participated in the management of the BLIPS shelter, and is a tax shelter organizer for purposes of Treas. Reg. § 301.6111-1T.

### c.   Pfaff Participated in the Sale of the BLIPS Tax Shelter

Pfaff participated in sales presentations to at least five BLIPS clients, including Joseph Nacchio.[121]  At these meetings, Pfaff pitched the tax benefits of the BLIPS shelter.[122]  In addition, Presidio employees kept Pfaff updated on their interactions with the KPMG sales team.[123]  Pfaff also helped to write a memo communicating the business rationale for the BLIPS premium loan.  This memo helped gain KPMG's approval to market and sell the transaction.[124]

Pfaff had direct contact with prospective purchasers of the BLIPS shelter, and communicated with those responsible for sale of the shelter.  Therefore, Pfaff participated in the sale of a tax shelter for the purposes of Treas. Reg. § 301.6111-1T.

### ii.   Pfaff Participated in Entrepreneurial Risks

A person who principally organizes, participates in the organization, or participates in the management of a tax shelter , must also either (i) be related to the tax shelter (or any principal organizer of the tax shelter), or (ii) participate in the entrepreneurial risks or benefits of the tax shelter.[125]  A person will be considered a participant in the entrepreneurial risks or benefits of a tax shelter if the person's compensation for performing the activities is contingent on any matter relating to the tax shelter, including if the compensation is based in whole or in part upon whether the interests in the tax shelter are actually sold.[126]

---

[114] A3:8, p. 51.
[115] A1:16-17, p. 27.
[116] A3:3, p. 36.
[117] A3:9, p. 51.
[118] A3:15, p. 57.
[119] A3:4, p. 37.
[120] A1:16, p. 27.
[121] A3:19, p. 59.
[122] A3:17, p. 58.
[123] Exhibit 18.
[124] A3:11, p. 54; A3:16, p. 58.
[125] Treas. Reg. § 301.6111-1T, Q&A-30.
[126] Id.

Pfaff participated in the entrepreneurial benefits of the tax shelter.  Each BLIPS transaction utilized an LLC known as the Strategic Investment Fund (SIF).  In each SIF, the members were:  Presidio Growth, LLC as the managing member, another Presidio entity, and the investor(s) (or investor(s) entities).

In his testimony before the Senate in November 2003, Pfaff's partner Larson stated that Presidio's management fee in the typical BLIPS transaction is a percentage of the losses to be generated in the transactions.[127]  In an e-mail from Bratton to KPMG, Bratton estimated the amount of the typical fee at 275 basis points, or 2.75%, and the total amount contributed to the transaction by the investor at 700 basis points, or 7% of the approximate loss to be generated.[128]  Larson testified before the Senate that the investor's capital contribution to the BLIPS transaction was 7 percent of the loss to be generated.[129]

As described above, Pfaff owned significant portions of the Presidio entities directly and through ownership of entities which held ownership interests in Presidio.  Pfaff was compensated through his salary and through the appreciation of his ownership interests.  Ninety-five percent of Presidio's revenue came through its work with KMPG on the BLIPS and FLIP/OPIS tax shelters.[130]

### iii.    Conclusion

As described above, Pfaff is principally responsible for organizing the BLIPS shelter.  Alternatively, Pfaff participated in the organization and management of the BLIPS shelter at a time when the shelter was not registered.  Pfaff also participated in the sale of the BLIPS shelter.

Pfaff participated in the entrepreneurial risks of the BLIPS shelter.

Therefore, Pfaff qualifies as a tax shelter organizer of the BLIPS shelter under I.R.C. § 6111.

### IV.    Pfaff Did Not Register the BLIPS & FLIP/OPIS Tax Shelters & Has Not Shown Reasonable Cause for the Failure to Register
####         A.    Pfaff Did Not Register the BLIPS & FLIP/OPIS Tax Shelters

A tax shelter organizer must register an investment deemed to be a tax shelter with the Secretary no later than the day on which the first offering for sale of interest in such tax shelter occurs.[131]  A tax shelter is considered registered when a properly completed Form 8264, Application for Registration of a Tax Shelter, is filed with the Service.[132]

The principal organizer, a person who participates in the organization of a tax shelter, a person who participates in the management of the tax shelter, or a person who participates in the sale of a tax shelter must register the tax shelter by the day on which the first offering for sale of interests in the tax shelter occurs.[133]  An exception to the registration requirement applies where the principal organizer, organizer, or manager has entered into a designation agreement.[134]  A designation agreement is a written agreement that designates one person as the tax shelter organizer responsible for registration.[135]

As described above, Pfaff is the principal organizer of the FLIP/OPIS and BLIPS tax shelters.  In the alternative, Pfaff participated in the organization, management, and sale of the FLIP/OPIS and BLIPS tax shelters.  There is no evidence that Pfaff entered into a designation agreement.  Therefore, Pfaff is individually responsible for the non-registration of the FLIP/OPIS and BLIPS shelters.

---

[127] A2:4, p. 31.
[128] A2:3, p. 31; Exhibit 20.
[129] A2:5, p. 32.
[130] Hearing Report, Vol. 1, p. 228.
[131] I.R.C. § 6111(a).
[132] Treas. Reg. § 301.6111-1T, Q&A-47.
[133] Treas. Reg. § 301.6111-1T, Q&A-34 to Q&A-36.
[134] Id.
[135] Treas. Reg. § 301.6111-1T, Q&A-34.

A transaction purporting to be similar to FLIP appears to have been registered with the Service on June 1, 1998.[136] An entity unrelated to the FLIP transactions at issue here was responsible for the registration. As described above, Pfaff had not entered into a designation agreement. Therefore, this registration does not absolve Pfaff of the responsibility to register the FLIP transactions at issue. Furthermore, the registration took place after each of the FLIP transactions at issue here had been completed, after the time period proscribed in I.R.C. § 6111(a).

A transaction purporting to be similar to OPIS appears to have been registered with the Service on November 1, 2000. An entity unrelated to the OPIS transactions at issue here was responsible for the registration. As described above, Pfaff had not entered into a designation agreement. Therefore, this registration does no absolve Pfaff of the responsibility to register the OPIS transactions at issue. Furthermore, the registration took place after each of the FLIP transactions at issue here had been completed, after the time period proscribed in I.R.C. § 6111(a).

Pfaff did not register any transactions as tax shelters.[137] The Service did not locate any registrations for the BLIPS transaction.[138] Pfaff failed to register the Notice 2000-44 and 2001-45 transactions as required. Therefore, the FLIP/OPIS and BLIPS transactions were not registered by Pfaff as required by I.R.C. § 6111.

### B.   Pfaff Has Not Demonstrated Reasonable Cause for the Failure to Register

No penalty is imposed under I.R.C. § 6707 with respect to any failure which is due to reasonable cause.[139] The determination of whether reasonable cause exists for failure to register a tax shelter is generally a question of fact.[140] When performing the factual analysis, all representations known to the tax shelter organizer, or for which there is a reason for the tax shelter organizer to have known, must be taken into account."[141] The tax shelter organizer is also deemed to know all representations that would have been discovered by a reasonable person acting in the tax shelter organizer's capacity if that person made inquiries about the tax shelter.[142]

To date, Pfaff has not provided any evidence that he had a reasonable cause for failure to register the BLIPS and FLIP/OPIS transactions. Therefore, the reasonable cause exception does not apply to Pfaff for the tax shelters at issue.

### V.   Computation of the I.R.C. § 6707 Penalty

A penalty applies to any person who is required to register a tax shelter under I.R.C. § 6111 and fails to register the shelter.[143] The amount of the penalty is the greater of 1% of the aggregate amount invested in such tax shelter or $500.[144] Where interests are sold to investors, the aggregate amount invested in a tax shelter is the aggregate amount to be received from the sale of interests in the investment and includes all cash, the fair market value of all property contributed, and the principal amount of all indebtedness received in exchange for interests in the investment, regardless of whether the proceeds of the investment are included in the investment base.[145]

### A.   FLIP/OPIS Penalty Computation

The following example illustrates the I.R.C. § 6707 penalty analysis for the FLIP/OPIS transactions. The I.R.C. § 6707 penalty for each FLIP/OPIS transaction at issue is included in Exhibit 8.

---

[136] Exhibit 23.
[137] A1:28-32, p. 29-30; Exhibit 9, October Transcript 32:5-7, 88:7-25, 122:9.24. Ken S. Clark, Office of Tax Shelter Analysis, Senior Program Analyst in the Ogden, Utah Service Center Campus did not find any registrations by any of the Presidio entities as of October 9, 2003 in the Internal Revenue Service's registrations database.
[138] Ken S. Clark, Office of Tax Shelter Analysis, Senior Program Analyst in the Ogden, Utah Service Center Campus did not find any registrations by any of the Presidio entities as of October 9, 2003 in the Internal Revenue Service's registrations database.
[139] I.R.C. § 6707(a)(1).
[140] Treas. Reg. § 301.6707-1T, Q&A-4.
[141] Id.
[142] Id.
[143] I.R.C. § 6707(a).
[144] I.R.C. § 6707(a)(2).
[145] Treas. Reg. § 301.6707-1T, Q&A-1.

### i.        Crumpler Transaction

Cumpler's aggregate amount invested is includes (i) the cash invested by Crumpler, and (ii) the fair market value of the property contributed by a limited partnership as part of the transaction. Crumpler's aggregate amount invested, and the section 6707 penalty, is determined as follows:

| | |
|---|---:|
| (i) | |
| Purchase of the Swap Transaction | $1,340,000 |
| Purchase of the call option | $60,000 |
| Purchase of shares of stock | $1,000,726 |
| Purchase of the call options on | $245,524 |
| Fees incurred by Crumpler | $210,920 |
| (ii) | |
| Foreign corp. basis in foreign bank stock | $20,514,695 |
| Aggregate Amount Invested | $23,371,865 |
| | x  1% |
| Penalty | $233,719 |

### ii.        Total FLIP/OPIS Penalty

The I.R.C. § 6707 penalty was computed for each FLIP/OPIS transactions individually, using the same methodology as shown above for the Crumpler transaction. The total FLIP/OPIS penalty is:[146]

1997: $1,397,574
1998: $17,824,803
1999: $5,522,649
Total: $24,745,026

### B.        BLIPS Penalty Computation

The following two examples illustrate the I.R.C. § 6707 penalty analysis for the BLIPS transactions. The I.R.C. § 6707 penalty for each BLIPS transaction at issue is included in Exhibit 5.

### i.        Nacchio Transaction

Nacchio's aggregate amount invested, and corresponding penalty under I.R.C. § 6707, is computed as follows:

| | |
|---|---:|
| Loan | $33,300,000 |
| Loan Premium | 20,000,000 |
| Capital Contribution | 1,463,312 |
| Additional Professional Fees Paid | 322,500 |
| Aggregate Amount Invested | $55,085,812 |
| | x  1% |
| Penalty | $550,858 |

### ii.        Shimmon Transaction

Shimmon's aggregate amount invested, and the section 6707 penalty, is determined as follows:

---

[146] Exhibit 8.

| | |
|---|---:|
| Loan | $133,300,000 |
| Loan Premium | 80,000,000 |
| Capital Contribution | 5,850,272 |
| Additional Professional Fees Paid | 1,000,000 |
| Aggregate Amount Invested | $220,150,272 |
| | x  1% |
| Penalty | $2,201,503 |

### iii.    Total BLIPS Penalty

The I.R.C. § 6707 penalty was computed for each BLIPS transactions individually, using the same methodology as shown above for the Nacchio and Shimmon transactions.  The total BLIPS I.R.C. § 6707 penalty is:[147]

    1999: $99,516,944
    2000: $35,970,056
    **Total: $135,487,000**

## CONCLUSION:

The Notice 2000-44 and Notice 2001-45 and transactions known as BLIPS and FLIP/OPIS constitute "tax shelters" within the meaning of I.R.C. § 6111(c).  Pfaff is a "tax shelter organizer" with respect to the BLIPS and FLIP/OPIS transactions within the meaning of I.R.C. § 6111(e).  Pfaff has a duty to register the BLIPS and FLIP/OPIS transactions pursuant to I.R.C. § 6111(a) and failed to do so.  Therefore, Pfaff is subject to penalties under I.R.C. § 6707.

---

[147] Exhibit 5.