

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 21, 2010

Mark F. Pomerantz, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, N.Y. 10019

Re:    **Deutsche Bank AG – Non-Prosecution Agreement**

Dear Mr. Pomerantz:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York (the "Office"), and with respect to tax offenses, the Tax Division, Department of Justice ("DOJ Tax"),[1] will not criminally prosecute Deutsche Bank AG ("Deutsche Bank")[2] for any crimes related to its participation in a conspiracy in violation of 18 U.S.C. § 371 to (a) defraud the United States and its agency, the Internal Revenue Service (hereinafter "IRS"); (b) commit tax evasion in violation of 26 U.S.C. § 7201; and (c) make and subscribe false and fraudulent tax returns, and aid and assist in the preparation and filing of said tax returns in violation of 26 U.S.C. § 7206, to the extent Deutsche Bank has disclosed such participation to this Office as of the date of this Agreement. Specifically, during the period between approximately 1996 and 2002, through the conduct of certain Deutsche Bank employees, Deutsche Bank participated in and implemented fraudulent tax shelters. In doing so and through other actions, Deutsche Bank assisted high net worth United States citizens, who, through 2005, reported approximately $29.3 billion in bogus tax benefits on their tax returns, mainly losses, resulting in the evasion of approximately $5.9 billion in U.S. individual income taxes on capital gains and ordinary income. The tax shelters that Deutsche Bank participated in and implemented include, among others: Foreign Leveraged Investment Program ("FLIP"), Offshore Portfolio Investment Strategy ("OPIS"), Bond Linked Issue Premium Structure ("BLIPS"), Custom Adjustable Rate

---

[1]     The protection against prosecution with respect to tax offenses set forth herein has been approved by DOJ Tax.

[2]     Deutsche Bank AG refers to Deutsche Bank AG, Taunus Corporation, and their respective subsidiaries, affiliates, and related entities.

EXHIBIT
5

Mark Pomerantz, Esq.
December 21, 2010

Debt Structure ("CARDS"), Currency Options Bring Reward Alternatives ("COBRA"), Currency Option Investment Strategy ("COINS"), Family Office Customized Partnerships ("FOCUS"), FX Digital Options, FX Digital Swaps, Treasury Shorts, Hedge Option Monetization of Economic Remainder ("HOMER"), Margate, Market Linked Deposits ("MLD"), Personal Investment Corporation ("PICO"), Partnership Option Portfolio Securities ("POPS"), Partnership Option Portfolio Securities Lite ("POPS LITE"), Presidio Bond, and Presidio FX. Deutsche Bank participated in approximately 1,300 deals involving over 2,100 customers, and implemented over 2,300 financial transactions related to these shelters. This conduct is described more fully in the Statement of Facts, which is attached hereto as Exhibit A, and incorporated by reference herein. Deutsche Bank accepts and acknowledges as true the facts set forth in the Statement of Facts. This Agreement is entered into by Deutsche Bank pursuant to authority conveyed by decision of the Management Board of Deutsche Bank.

This Agreement does not provide any protection against prosecution for any crimes except as related to the tax shelters set forth above.

Unless stated otherwise in this Agreement, Deutsche Bank's obligations under this Agreement will continue until the later of (1) a period of two years from the date of the signing of this Agreement, or (2) the expiration of the tenure of the Independent Expert, as that term is defined herein.

## Continuing Obligation to Cooperate

It is understood that Deutsche Bank (a) shall truthfully and completely disclose all information with respect to the activities of itself and its officers, agents, and employees concerning all matters about which this Office inquires of it, which information can be used for any purpose; (b) shall cooperate fully with this Office, the civil and criminal branches of the IRS, the civil branch of DOJ Tax, and any other law enforcement agency designated by this Office; (c) shall attend all meetings at which this Office requests its presence and use its best efforts to secure the attendance and truthful statements or testimony of any past or current officers, agents, or employees at any meeting or interview or before the grand jury or at trial or at any other court proceeding; (d) shall provide to this Office upon request, any document, record, or other tangible evidence relating to matters about which this Office or any designated law enforcement agency inquires of it; (e) shall assemble, organize, and provide in a responsive and prompt fashion, and upon request, expedited fashion, all documents, records, information and other evidence in Deutsche Bank's possession custody and control as may be requested by the Office, the IRS, or DOJ Tax; (f) shall volunteer and provide to the Office any information and documents that come to Deutsche Bank's attention that may be relevant to the Office's investigations and proceedings; (g) shall bring to this Office's attention all criminal conduct by or criminal investigations of Deutsche Bank or its senior managerial employees, and, with respect to conduct or investigations concerning products or transactions that may run afoul of U.S. federal income tax laws, rules, and regulations, all Deutsche Bank employees, that comes to the attention of Deutsche Bank's

2

Mark Pomerantz, Esq.
December 21, 2010

Management Board or senior management; (h) shall bring to the Office's attention any administrative or regulatory proceeding or civil action or investigation by any governmental authority that alleges fraud by Deutsche Bank; and (i) shall commit no crimes whatsoever. Moreover, any assistance Deutsche Bank may provide to federal criminal investigators in connection with this Agreement shall be pursuant to the specific instructions and control of this Office and designated investigators. Deutsche Bank's obligations under this paragraph will continue until the later of (1) a period of two years from the date of the signing of this Agreement, or (2) the date upon which all prosecutions and appeals arising out of, or relating in any way to, the conduct described in the Statement of Facts are finally concluded, or (3) the date when all IRS and DOJ Tax civil proceedings and appeals relating to the tax shelter activity described in this Agreement are finally concluded.

### Payments and Forfeiture Obligations

It is understood that Deutsche Bank agrees to pay to the United States a sum of money in United States currency equal to $553,633,153. This payment is attributable to the following: (1) in lieu of a fine, payment in the amount of the fees Deutsche Bank earned from its participation in the tax shelter activity described in this Agreement; (2) in lieu of restitution, payment in the amount of taxes and interest the IRS was unable to collect from taxpayers because of the expiration of the civil statute of limitations on collection, and for suspended interest the IRS was unable to collect from taxpayers; and (3) the penalty Deutsche Bank has agreed to pay pursuant to the Closing Agreement referenced below to settle the IRS's promoter penalty examination. Deutsche Bank agrees to forfeit to the United States all of these funds pursuant to 18 U.S.C. Section 981(a)(1)(c), less the promoter penalty, which will be paid directly to the IRS in accordance with the terms of the Closing Agreement. Deutsche Bank must transfer the funds to be forfeited to the United States within thirty days of executing this Agreement. Such payment shall be made by wire transfer to the Department of Treasury. Deutsche Bank agrees to execute all documentation necessary to effectuate the forfeiture of the property. Deutsche Bank further agrees that it will not file a claim with the court or otherwise contest this civil forfeiture action and will not assist a third party in asserting any claim. It is further understood that Deutsche Bank will not file or assist anyone in filing a petition for remission or mitigation with the Department of Justice or Treasury concerning this property.

It is further understood that Deutsche Bank will not take any deductions on its tax returns, or seek any other tax related benefit, for any of the financial payments it makes pursuant to this Agreement.

### Obligations Not to Violate the Law and Consequences for Violating the Law or Breaching the Agreement

It is understood that, should Deutsche Bank commit any crimes subsequent to the date of the signing of this Agreement, or should the Government

Mark Pomerantz, Esq.
December 21, 2010

determine that it has knowingly given false, incomplete, or misleading testimony or information, or should it otherwise violate any provision of this Agreement, Deutsche Bank shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including perjury and obstruction of justice. Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against Deutsche Bank, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed. By this Agreement, Deutsche Bank expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay. Such waivers are knowing, voluntary, and in express reliance on the advice of Deutsche Bank's counsel.

It is understood that if the Office, in its sole discretion, has determined that Deutsche Bank has committed any crime after signing this Agreement or has given false, incomplete, or misleading testimony or information, or has otherwise violated any provision of this Agreement: (a) all statements made by Deutsche Bank to this Office or other designated law enforcement agents, including Exhibit A, the Statement of Facts, and any testimony given by Deutsche Bank before a grand jury or other tribunal, whether prior to or subsequent to the signing of this Agreement, and any leads from such statements or testimony shall be admissible in evidence in any criminal proceeding brought against Deutsche Bank; and (b) Deutsche Bank shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed. It is the intent of this Agreement to waive all rights in the foregoing respects.

It is understood that Deutsche Bank has entered into a Closing Agreement with the IRS in connection with IRS's civil promoter penalty examination of Deutsche Bank and has agreed to pay the IRS a civil penalty in the amount of $149,839,000, which is included in the $553,633,153 referenced on page three of this Agreement. It is further understood that the resolution reached in the Closing Agreement is a condition precedent to this Agreement and that Deutsche Bank's violation of any terms and provisions of the Closing Agreement shall constitute a violation of this Agreement.

## Compliance Measures

It is understood that Deutsche Bank shall maintain throughout its U.S. operations and with respect to any Deutsche Bank operations affecting U.S. income taxes, an effective compliance and ethics program that fully comports with the criteria set forth in Section 8B2.1 of the 2009 edition of the United States Sentencing Guidelines Manual. Deutsche Bank represents that it has implemented certain procedures (the "Compliance Measures") that enable it to identify products and transactions that may run

4

Mark Pomerantz, Esq.
December 21, 2010

afoul of U.S. federal income tax laws, rules, and regulations and that the Compliance Measures enable it to avoid the execution of such transactions by or with the assistance of Deutsche Bank. Deutsche Bank further represents that the Compliance Measures are effective within the meaning of Section 8B2.1 of the 2009 edition of the United States Sentencing Guidelines Manual.[3]

Because the Government has not conducted an independent examination into whether the Compliance Measures have been implemented or whether they are effective in achieving compliance with U.S. federal income tax laws, rules and regulations, in lieu of such independent examination, Deutsche Bank has voluntarily agreed to retain an independent expert (the "Independent Expert"), for selection by the Office and approval by the Office of the Deputy Attorney General, whose jurisdiction will be to evaluate the implementation and effectiveness of the Compliance Measures. The Independent Expert's responsibilities will include evaluating the Compliance Measures and determining whether they are adequate to achieve compliance with U.S. federal income tax laws and to prevent and detect misconduct relating to products and transactions susceptible to abuse on behalf of high net worth individuals. The Independent Expert will review and monitor Deutsche Bank's maintenance and execution of the Compliance Measures and, as required, any other relevant Deutsche Bank compliance program, and recommend such changes as are necessary to ensure that Deutsche Bank is implementing and maintaining an effective Compliance & Ethics Program as defined in Section 8B2.1 of the 2009 edition of the United States Sentencing Guidelines Manual. The terms of the Independent Expert's retention, including, without limitation, the Independent Expert's jurisdiction, powers, and duties (the "Verification Procedures"), are set forth in Section II of the document entitled "Compliance Measures and Verification Procedures" and all of the terms and provisions of Section II A. are incorporated by reference herein. Deutsche Bank agrees to adopt all recommendations submitted by the Independent Expert unless Deutsche Bank objects to any recommendation and the Office agrees that adoption of such recommendation should not be required. It is understood that Deutsche Bank's failure to adopt such recommendations, unless the Office agrees that adoption of such recommendations is not required, shall constitute a violation of this Agreement. Deutsche Bank further agrees that the "Tax Specific Policies" set forth in Section I A. 2. of the Compliance Measures, incorporated by reference herein, must be implemented and maintained for the Compliance Measures to be effective and that any failure to implement or maintain the "Tax Specific Policies" shall constitute a violation of this Agreement.

It is further understood that this Agreement does not bind any federal, state or local prosecuting authority other than this Office and, to the extent set forth

---

[3]     The Compliance Measures are set forth in Section I of the document entitled "Compliance Measures and Verification Procedures," attached hereto as Exhibit B.

Mark Pomerantz, Esq.
December 21, 2010

above, DOJ Tax. This Office will, however, bring the cooperation of Deutsche Bank to the attention of other prosecuting offices, if requested by Deutsche Bank.

It is further understood that Deutsche Bank and/or this Office may disclose this Agreement and Exhibits A-B attached hereto to the public.

Mark Pomerantz, Esq.
December 21, 2010

       With respect to this matter, this Agreement supersedes all prior, if any, understandings, promises and/or conditions between this Office, DOJ Tax, and Deutsche Bank. No additional promises, agreements, and conditions have been entered into other than those set forth in this letter and none will be entered into unless in writing and signed by all parties.

       Very truly yours,

       PREET BHARARA
       United States Attorney

By: _Bonnie Jonas_____

       Bonnie B. Jonas/Christopher L. Garcia
       Assistant United States Attorneys
       (212) 637-2472/1022

APPROVED:

_____

Boyd M. Johnson III
Deputy United States Attorney

AGREED AND CONSENTED TO:

By: _____

Richard H. Walker, Managing
Director and General Counsel,
Deutsche Bank AG

Date: December 21, 2010

By: _____

Joseph Polizzotto, Americas General
Counsel, Deutsche Bank AG

Date: December 21, 2010

By: _____

Joseph Polizzotto, Managing
Director, Taunus Corporation

Date: December 21, 2010

By: _____

Stuart Clarke, Managing Director,
Taunus Corporation

Date: December 21, 2010

APPROVED:

By: _____

Mark F. Pomerantz,
Attorney for Deutsche Bank, AG

Date: December 21, 2010

7

# Exhibit A

## Statement of Facts

1.  Deutsche Bank AG is a Germany-based financial institution that operates in the United States through its New York branch at 60 Wall Street, New York, New York.  It is and was the ultimate parent of or successor to various related entities, including Deutsche Bank Trust Company Americas, Deutsche Bank Securities, Inc. and Alex. Brown.  Collectively, all of the foregoing entities are referred to herein as "DB."[1]

2.  As set forth in more detail below, between approximately 1996 and 2002, DB unlawfully, willfully and knowingly participated in financial transactions executed in connection with a number of tax shelter transactions primarily devised by others by, among other things, assisting tax shelter promoters to structure financial transactions that would be used to generate substantial tax benefits (generally losses), by preparing financial transaction documents that would be used by others to mislead the IRS regarding the true nature of the transactions, and by executing the transactions for the taxpayer clients of the promoters.  DB acknowledges that it was wrong and unlawful to have engaged in these transactions and it regrets having done so.

3.  At the time that DB participated in the shelters, it knew or should have known that:

    (a)  DB's participation in executing the financial transactions was intended to create the appearance of investment activity, but taxpayers were entering into these transactions for the primary purpose of avoiding taxes, as opposed to making profits on the transactions;

    (b)  in order to obtain tax benefits, the taxpayers and the tax shelter promoters would use documents that falsely described the purpose and intent of the transactions; and

    (c)  the tax shelters, and the financial transactions DB facilitated in connection with the shelters, would be used by taxpayers and others to generate purported tax losses that would be used to evade the payment of several billion dollars in federal income taxes that in fact were due and owing.

4.  DB's supervisory and internal controls with respect to these transactions were inadequate.  Specifically, for example, DB did not have adequate policies and procedures for analyzing client tax-motivated transactions in which DB participated as a counterparty, nor for involving its internal control functions in an appropriate analysis and approval process for such transactions.

---

[1] During the relevant time period, DB employed approximately 92,000 people, including approximately 14,000 in the United States.

## The Tax Shelters

5.      DB participated in approximately 15 different tax shelters, engaging in at least 1,300 deals involving over 2,100 customers, and implementing over 2,300 financial transactions.  These tax shelter transactions included (among others): 56 BLIPS transactions; 62 FLIP/OPIS transactions; 16 COBRA transactions; 63 COINS transactions; 474 FX Digital Options transactions; 54 FX Digital Swaps transactions; 36 HOMER transactions; 100 PICO transactions; and 114 POPS transactions. Customers used the transactions to claim approximately 29.3 billion dollars in bogus tax benefits, mainly losses.

### BLIPS

6.      DB executed approximately 56 BLIPS transactions between September and December 1999.  Prior to executing the transactions, DB employees took steps to have the BLIPS series of transactions approved within DB.  In that connection, certain internal documents falsely identified the transaction as an investment strategy.  DB's BLIPS credit reports, for example, falsely identified the primary purpose of BLIPS as providing the investor with an opportunity to make profits based on the potential depreciation of emerging markets currencies.  Those internal credit reports did not recite that the BLIPS transactions were designed to enable BLIPS investors to claim a purported tax benefit, although the BLIPS transactions were tax-motivated and, in practical terms, involved no credit or investment risk to DB and virtually no overall profit potential to the customers.

7.      Before participating in the transactions, DB obtained a copy of a draft KPMG opinion letter on the underlying tax merits of the BLIPS transaction. DB was aware that Law Firm No. 1 also had been retained to provide a separate opinion to the customers. The KPMG and Law Firm No. 1 opinions each represented that the customers' tax position would "more likely than not" withstand IRS challenge. DB also obtained its own opinion from another major New York law firm with regard to whether it had any tax shelter registration and list maintenance obligations for its participation in BLIPS. DB did not seek or obtain an independent written opinion regarding the merits of the tax arguments that it understood would be advanced by taxpayers. While DB was advised by the major New York law firm that the taxpayer argument would not be frivolous if properly presented to the IRS, that advice was based on certain representations about the taxpayers' intent that DB knew or should have known were incomplete, false, and misleading.

8.      For example, the BLIPS transactions were structured as 7-year loans.  DB knew that the purpose of this structure was to reduce the taxes of BLIPS customers.  DB prepared and executed loan documents that customers could use to support their position vis-a-vis the IRS that the transactions were part of a highly-leveraged investment program.  However, the plan as understood by DB employees was not a highly leveraged investment program.  These DB transactional documents

could be used by the customer to falsely argue that loan funds were borrowed to provide leverage for forward contracts that involved shorting foreign currencies pegged to the U.S. dollar ("the forward contracts"), which were foreign currency investments of the customers in the BLIPS transactions. However, separate cash funds provided by the customers as part of the "all-in" cost for participating in BLIPS were the only funds used to fund the forward contracts. Although the loan documents purported to permit the customer to make foreign currency investments with the loan proceeds, the loan proceeds and the customers' cash contribution served to collateralize the loans and DB knew that the loan proceeds would not be used in any way to fund or leverage the forward contracts.

9.      The BLIPS loans also were documented as seven-year loans with options to unwind early. DB knew that this documentation was necessary in order to generate the tax benefits sought by the customers. While each customer had the contractual right to keep the loan outstanding for seven years, DB understood that all the borrowers would unwind their transactions in 60-90 days, and that the customers did not expect to maintain the loans for longer periods, and DB acted in accordance with this understanding. In order to achieve the desired tax benefit, all of the 1999 BLIPS transactions executed by DB in fact were unwound by customers at around the 60-day mark, before the end of 1999, so that customers could claim purported tax losses in that year. In order to complete the transactions in this time frame, DB processed many of the BLIPS transactions in October 1999.

10.     The BLIPS transactions were designed by KPMG and Presidio to create the impression that the loans had an unusual premium structure at an interest rate well above prevailing market rates. DB knew that the premium structure was necessary for the loans to generate the tax benefits sought by the customers. As part of the overall structure, the customer and DB entered into a series of interest rate swaps with a retroactive effective date to the date of the initial loan book entries. The net effect of the swaps was that the clients paid only a market rate of interest on the full amount of the loaned funds (principal and premium). In other words, although the loans were described in the transactional documents as above-market, fixed-rate loans with an unamortized premium, the interest rate swaps effectively converted the loans to variable-rate loans, at market rates, with no premium. This swap was part of the original agreement between DB and Presidio, agreed to before the first BLIPS transaction began.

11.     The forward contracts, which DB conducted on behalf of the BLIPS customers, were executed in the aggregate at the direction of Presidio and then allocated among the individual customers' BLIPS transactions. DB did not subject the individual customers to scrutiny as to their creditworthiness before entering into the non-recourse loans; the entities to which the loans were made had no significant assets and the loan proceeds were pledged as collateral for the loans themselves.

12.     The BLIPS tax opinion letters drafted by KPMG represented that DB, the Presidio entities, and the customer all acted at arm's length with respect to the BLIPS transaction, and that there was no legally binding arrangement to

3

conduct the transaction in the way described in the opinion letters. In fact, while there was no written or formal agreement requiring each party to complete the transaction in the way described in the opinion letters, it was understood by all parties that the various steps in the BLIPS transaction were orchestrated in advance, and that each transaction would be executed in accordance with the description in the opinion letters, as in fact took place.

13.   DB's fees for the BLIPS transactions were calculated as a percentage of the loss the customer was attempting to generate, typically 1.25 percent of the targeted loss.

<u>FLIP/OPIS</u>

14.   During 1997 through 1999, DB participated in another tax-motivated transaction devised by KPMG known as FLIP/OPIS. As part of the FLIP/OPIS structure, DB agreed to lend money to a Cayman single-purpose entity to purchase DB stock. DB knew that FLIP/OPIS customers were not borrowing the loan proceeds to increase their ability to profit from the appreciation in value of DB stock, but rather to avoid paying United States taxes.

15.   Prior to executing the FLIPS/OPIS transactions, DB received draft FLIP/OPIS tax opinions prepared by KPMG and Law Firm No. 1. The KPMG and Law Firm No. 1 opinion letters represented that DB agreed to extend a loan to the Cayman single purpose entity to purchase DB stock. DB did lend money to the Cayman entity that was used to purchase DB stock. The structure of the transactions ensured that DB was not exposed to any lending or credit risk as a practical matter; the loan agreement provided that the stock that was purchased with the loan proceeds would serve as collateral for the loan. When large purchase orders were placed on behalf of the customers on the Frankfurt Exchange, DB traders would simultaneously place a nearly offsetting similarly large sale order on its own behalf. Moreover, the stock was fully hedged against depreciation by equity derivatives issued by DB. Specifically, DB and the Cayman entity entered into put and call agreements, by which DB purchased back from the Cayman entity in approximately seven weeks the same DB stock that the Cayman entity had purchased with the loan proceeds. Any remaining potential risk to DB was fully collateralized with cash provided by the customer, who was a partner in the Cayman entity.

16.   The KPMG and Law Firm No. 1 tax opinion letters further represented that the taxpayers entered into the FLIP/OPIS transaction in an effort to profit from the appreciation of DB stock. Given the structure and the short duration of the transactions, there was virtually no chance that the customer would profit significantly from an increase in the price of DB stock.

17.   The FLIP/OPIS tax opinions represented that DB, the Cayman entity, and the customer all acted at arm's length in negotiating the terms of the transaction, and that there was no legally binding or written arrangement to conduct the loan, purchase, and re-sale of securities in any particular manner. While there

4

was no written or formal agreement requiring each party to complete the transaction in the way described in the opinions, it was understood by all parties that the FLIP/OPIS transaction steps were orchestrated in advance, and that each transaction would be executed in accordance with the description in the tax opinion letters, as in fact took place. Moreover, DB knew that the Cayman entity was controlled by Presidio and was not an "independent" or "arm's length" negotiator with respect to the customer.

<u>Short Option Strategies ("SOS")</u>

18.     DB participated in a series of transactions referred to herein as "SOS" (for "Short Option Strategies") with promoters Jenkens & Gilchrist ("J&G"), KPMG, Ernst & Young ("E&Y") and others. The SOS transactions included FX Digital Options, FX Digital Swaps, COBRA, HOMER, and COINS.

19.     The SOS transactions were designed to generate a substantial ordinary or capital loss through the creation of an artificially high basis in an interest in a partnership or other entity through a series of purchases and sales of off-setting options on foreign currency. DB understood that the SOS transactions were designed solely to achieve tax benefits for customers. DB personnel created the individual paired options structures for specific use in the tax shelter transactions. Given the fees charged by the other promoters, there was no reasonable opportunity for the clients to make an overall profit. Specifically, certain DB employees understood that:

(a)     FX Digital Options and COBRA transactions were designed to generate tax losses based on long and short option positions; the transactions involved offsetting and paired options that netted out to a relatively small long option position;

(b)     FX Digital Swaps transactions were designed to generate a tax loss based on a pair of offsetting contingent swap payments; the contingent swap payments netted out to a relatively small contingent payment;

(c)     HOMER transactions were designed to generate a tax loss based on two pairs of barrier options that netted out to place at risk a relatively small amount of the overall premium for the four options, while DB also provided the taxpayers with a loan for the purchase of the HOMER options, with the understanding that the loan posed no risk to the bank but was being employed by the taxpayers to achieve the creation of the tax loss; and

(d)     COINS transactions were designed to generate a tax loss based on long and short foreign currency barrier options; the offsetting paired options netted out to a relatively small long option position.

20.     J&G and other promoters of the SOS transactions issued tax opinions to customers participating in them. While customers received opinions from tax advisors that the transaction was more likely than not to withstand a challenge by

5

the IRS, DB did not, as an institution, seek to obtain copies of the tax opinions. Certain DB employees received the J&G opinion letters because those employees executed their own SOS transactions in connection with their personal tax obligations. The J&G opinion letters falsely represented that certain steps of the short option transactions were executed for substantial non-tax business reasons (such as a transfer of the options from the partnership to a corporation), whereas in fact they were carried out solely to achieve the desired tax result. Also, while the J&G opinion letters stated that there was no obligation on the part of any party to complete any particular step of the FX Digital Options or COBRA transactions, there was an understanding that each party to the transaction – including DB – would carry out its role in effectuating each of the steps in order to produce the tax loss.

21.    Customers had to pay substantial fees to the promoters of the SOS transactions, like J&G. Those fees dwarfed the potential investment return in virtually all of the FX Digital Options transactions executed by DB. Indeed, in most of the FX Digital Options transactions, the best that the customer could hope to achieve was a doubling of his or her money, and there was only approximately a one-in-three chance of doing so. Certain DB employees knew that the fees charged by J&G alone often were greater than the doubled return, and therefore there was virtually no chance for a customer to make a profit from the overall transaction.

22.    While the customers were not contractually prohibited from separating the options, DB would not have permitted the long and short legs of any pair of offsetting digital options or swaps to be segregated into separate component options without requiring the taxpayer to pay the full premium for the long leg and to satisfy substantial credit requirements in the event that the short leg terminated in DB's favor. The taxpayers usually executed their transactions through LLCs that had few assets other than those associated with the tax transactions. The LLCs did not have the resources to pay the full premiums for the long transaction legs or to satisfy the substantial credit requirements that would have been required to transfer the short legs separate from the long legs.

23.    The long and short legs of any given pair were priced as if they were one unified transaction. In pricing the options transactions, DB understood that the starting point was the amount of tax loss desired by the customer. For example, in the FX Digital Options transactions, the stated price or premium for the long option was equal to the tax loss desired by the taxpayer. DB's fee for the options was generally 1% of the premium for the long option, or in other words, 1% of the customer's desired tax loss. In reverse engineering the options to fit the parameters required for the tax loss, DB calculated premiums for both the long leg of the transaction being purchased by the taxpayer and the short leg of the transaction being purchased by DB that were, in many cases, significantly above the theoretical Black-Scholes value of the options being purchased and that provided a 1% net premium for DB.

24.    The FX Digital Options and COBRA transactions were structured with a supposed "lottery payout" potential – that is, many customers were

6

told that there was a chance, albeit an extremely remote one, that the options could result in a very large profit if on the measurement day the underlying currency valuations happened to hit within what was typically a two "pip" difference between the strike price for the long digital option and the short digital option. In such event, the customer would be paid on one option but would not have to pay on the offsetting option leg. Virtually all of the DB FX Digital Options and COBRA transactions had a 2-pip spread, and the area within the spread was referred to at times as the "sweet spot." As DB knew, there was virtually no chance that the sweet spot would be hit, and in fact it was not hit in any of the transactions that DB executed. In fact, DB did not hedge for that possibility and ultimately recorded the options spreads in its internal risk management system as having a zero pips spread.

25.     On more than one occasion, J&G personnel instructed DB to sell the wrong percentage of foreign currency from a customer's DB account. These incorrect instructions, which affected the amount of ordinary loss that could be claimed by the customer, were not discovered until after the close of the tax year in which the options transactions were executed. To correct these errors, J&G requested that DB employees execute new transactions in the correct amounts in the following tax year: DB did so. While the new transactions were reflected on the customers' account statements as settling at or around the time they were actually executed, the account statements indicated that the transactions were executed "as of" dates in the previous tax year. DB knew that J&G and the customers would rely on the "as of" entries in the account statements to prepare tax returns that reported the transactions not when they actually occurred, but when the customer intended the transaction to have occurred but for the incorrect instructions that had been provided to DB.

26.     Various DB Alex. Brown brokers and others, including personnel in New York, executed their own FX Digital Option and FX Digital Swaps transactions in order to evade their own personal income taxes. The DB employees who entered into these personal transactions knew that the transactions were not entered into, and the various steps of the transactions were not carried out for, substantial non-tax business reasons, as was represented in the opinion letters that these employees received in connection with their transactions. Rather, the transactions were entered into to avoid their own tax obligations. Those obligations arose, in substantial part, from the salaries and commissions the DB employees made as a result of assisting the J&G lawyers and others in implementing the SOS transactions for others.

27.     J&G provided its opinion letter free of charge or at a discounted rate to certain of the DB employees that executed their own transactions. This effectively granted to these employees a gratuity for which other taxpayers paid tens if not hundreds of thousands of dollars or more depending on the size of the transaction. The DB employees accepted these gratuities from J&G in implementing J&G option and other transactions.

28.     In August 2000, the IRS issued Notice 2000-44 in which the IRS announced that losses resulting from options transactions substantially similar to

7

those that DB was executing did not represent bona fide losses reflecting actual economic consequences and were not allowable as deductions for federal income tax purposes. The Notice also warned that the IRS might impose penalties on the various participants in the transactions. Despite DB's awareness of the issuance of this Notice, DB continued to engage in the transactions.

## The PICO and POPS Tax Shelter Activities

29.     From 1999 through 2001, DB participated in approximately 100 PICO transactions and approximately 114 POPS transactions. The PICO and POPS transactions were marketed to customers by various accounting firms and other entities as a means to avoid the payment of income tax. Law Firm No. 2 wrote most of the opinions for the PICO and POPS transactions, and other law firms also wrote opinion letters. DB understood that the customers' primary motivation for entering into the transactions was tax avoidance, and that each transaction involved a pre-conceived series of steps designed to generate a targeted tax benefit for the client.

30.     During early 2000, while PICO was being developed, DB reviewed a draft legal opinion prepared by Law Firm No. 2. This opinion purported to provide PICO clients with support for the legitimacy of the transaction, and protection against IRS penalties, by concluding that PICO would, more likely than not, survive IRS attack. The law firm's opinion began by falsely characterizing the PICO client's S Corporation as "a type of new asset management and estate planning vehicle." The draft opinion made no mention of the primary purpose for the formation of the S Corporation – to achieve substantial tax benefits for the client – but instead falsely described the entity as having been formed "to create a special purpose investment management company to capitalize on [Promoter X's] expertise in the foreign exchange markets and general investment management services." The law firm's draft opinion also falsely represented that PICO was designed to facilitate potentially substantial estate tax savings and protection of family assets.

31.     Law Firm No. 2's draft PICO opinion contained a set of factual representations, purportedly made by the entity, upon which the opinion was specifically premised. Among those representations was the following statement: "The principal purpose of each Combined Transaction [referring to the straddles] is not the avoidance of federal income taxes." This particular representation was false. The execution of each step in the PICO transactions – including the purported "investment" in straddles – was primarily motivated by tax consequences rather than profit. For instance, the straddles had to be terminated at a specific time in order for each client to obtain the tax benefits PICO was designed to generate. Further, the purpose of setting up the S Corporation with both the client and the Promoter X principal as initial shareholders was to enable the splitting of gains and losses to achieve tax consequences. Although the law firm's draft PICO opinion stated that the Promoter X principal would become an initial shareholder in the corporation "in order to demonstrate the potential return available through [Promoter X's] foreign currency trading activity, and to share the risks of that activity," DB knew that this and other representations in the opinion were not true.

32.    The POPS transactions employed a multi-tiered partnership structure and, like PICO, utilized straddles to generate non-economic losses that were used by customers to offset income. During early 2000, while POPS was being developed, DB received and reviewed draft POPS legal opinions from Law Firm No. 2 and other law firms. These opinions purported to provide support for the legitimacy of the transaction, and protect against IRS penalties, by concluding that POPS more likely than not would survive IRS scrutiny. These opinions were based on false and misleading misrepresentations, namely that the transactions were designed to achieve investment objectives when in reality they were motivated solely by the desire to avoid tax obligations.

33.    DB also received and reviewed a "Technical Memorandum" prepared by Accounting Firm No. 1, which marketed POPS to its clients. Accounting Firm No. 1's "Technical Memorandum," drafted in March 2000, began by describing POPS as a "Private Hedge Fund" and "a proprietary investment program for high net worth investors . . . designed to enable investors to diversify a portion of their portfolio into 'alternative investments' to which most high net worth investors have limited access." The Technical Memorandum made no reference to tax benefits as a reason for the clients to enter into the POPS transaction, though this was understood to be the clients' dominant purpose.

34.    Law Firm No. 2's and Law Firm No. 1's draft POPS opinions, which were provided to DB, similarly focused on purported non-tax business reasons for various steps in the transaction. Like Law Firm No. 2's draft PICO opinion, the Law Firm No. 2 POPS draft discussed the deductibility of straddle losses, and the "primary motive" test that would apply. It also was specifically premised on a factual representation that "[t]he principal purpose of the Combined Transactions is not the avoidance of federal income taxes." Elsewhere, the Law Firm No. 2 draft sought to distinguish the facts in POPS from those in another case by stating, "[T]hese transactions are clearly not being promoted as a method of achieving favorable treatment under the tax laws." The Law Firm No. 1 draft opinion contained many of the same false and misleading statements contained within the Law Firm No. 2 and Accounting Firm No. 1 documents, describing POPS, for example, as a "proprietary investment program for high net worth investors . . . designed to enable [them] to diversify a portion of their investment into 'alternative investments[.]'"

35.    DB understood that the POPS transaction was primarily tax-motivated. In May 2001, in a communication to a DB Alex. Brown broker, a former DB employee who handled sales on DB's Foreign Exchange desk commented that the IRS was "getting more and more concerned with economic substance as the POPS trade basically has none."

### DB's Enhanced Policies And Procedures and Pledge of Continued Cooperation

36.    · DB acknowledges that its internal control systems at the time of the tax shelter transactions discussed above were inadequate to prevent employees

from executing inappropriate or unlawful transactions. In recognition of this fact, DB has implemented over the course of several years, and commits to maintain on an ongoing basis, enhanced policies and procedures to ensure that it complies with the tax laws and does not participate in transactions that may be used to defraud the United States. Among other things, DB established:

     (a)    a Prohibited Tax-Oriented Transactions Policy, pursuant to which DB will not engage in transactions in which the underlying strategy has been identified by the IRS as a reportable tax avoidance transaction (or a substantially similar transaction), including listed transactions;

     (b)    a Tax Opinion Policy, pursuant to which any business unit engaging in a structured transaction in which Deutsche Bank is a participant, other than solely as an advisor, must obtain a "should" level opinion from outside counsel as to the tax consequences to Deutsche Bank of its participation. If outside counsel does not believe a "should" level of confidence is warranted, the transaction cannot proceed;

     (c)    a Global Reputational Risk Management Program, which requires all DB business and control units at all levels to own and evaluate reputational risk, including scrutinizing transactions to determine whether they are designed primarily to be tax-advantaged, have no valid business purpose, or lack economic substance; and

     (d)    a New Product Approval ("NPA") Policy, which mandates that all proposed new transactions go through the NPA process. An NPA approval is required before groups such as Treasury, Credit, or Business Area Controlling can fund, extend credit for, or allocate profits from any transaction.

     37.    DB has also pledged, and will continue, to cooperate with the Office's investigation relating to the tax shelter activities of itself and others.

# Exhibit B

## Compliance Measures and Verification Procedures

Deutsche Bank AG and its affiliates (collectively, "DB") are committed to compliance with: (1) all applicable laws, rules and regulations that govern DB's activities; (2) DB's internal policies and procedures; and (3) the highest standards of ethical conduct.  DB's commitment to these standards is reflected in a comprehensive framework of policies and procedures, business supervisory requirements, oversight by control groups, such as the Legal, Compliance and Group Audit Departments, and various corporate governance committees.  DB has set forth below a description of key general and tax-specific policies and procedures, as well as corporate governance committees (collectively, the "Compliance Measures"), that are designed to ensure, among other things, that DB's employees are aware of and comply with the applicable laws, rules and regulations, and high standards of ethical conduct.

I.     Compliance Measures

    A.     Policies and Procedures

        1.     General Policies and Procedures

            (a)     *Americas Code of Professional Conduct*: All DB Americas employees must certify on an annual basis that they have read and understood the Americas Code of Professional Conduct (the "Code"), which requires managers and employees at all levels to be aware of and comply with applicable laws, rules, regulations and DB policies. Employees have an obligation to comply with the Code, and failure to do so can result in disciplinary action, including termination.  The Code provides, among other things:

- Any suspected violation of applicable laws, rules, regulations or DB policies must be reported to the employee's Department Head.  If, however, it is not practical for an employee to report the matter to his or her Department Head, or if the employee does report the matter and it is not addressed, the employee should report the matter, as appropriate, to the relevant Compliance Officer or the Legal Department.

- Employees may also report issues anonymously by calling the DB Americas Employee Hotline.

- To encourage reporting of any perceived violation of laws, rules, regulations or DB policies, the Code prohibits retaliation against any employee who makes a

1

good faith report, even if an investigation determines there has been no violation.

- All employees are required to cooperate fully with any investigation relating to allegations of misconduct, legal or regulatory violations, or violations of the Code, including investigations by third parties such as governmental and quasi-governmental regulators and prosecutors.

(b)   _Reputational Risk Management Program Policy_: This Policy, effective June 15, 2005, requires that all business and control units own and evaluate reputational risk, including any threat that a transaction or business practice will negatively impact the public's trust in DB. When evaluating reputational risk with respect to tax-related issues, the business and control groups are expressly required to consider questions such as:

- Could the transaction be viewed as having no valid business purpose or economic substance?

- Was the transaction designed primarily to achieve a financial reporting or tax effect?

- Does the transaction have an impact on the relationship between DB entities and fiscal (tax) authorities?

Reputational risk issues may be addressed by senior management and senior control group members, including, ultimately, the Regional Governance Board ("RGB"), whose members include the Regional Chief Executive Officer and Regional Chief Operating Officer ("COO"), and the Heads of the Finance, Market Risk Management, Compliance, Legal and Credit Risk Management Departments. The RGB does not include a representative of any business unit. The RGB has formally delegated consideration of reputational risk issues to the Americas Reputational Risk Committee ("ARRC"), a permanent sub-committee of the RGB that is responsible for reviewing, resolving and reporting on all reputational risk issues brought forward for its consideration. The members of the ARRC are the Regional General Counsel, the Regional COO and the Regional Head of Compliance. Issues remaining unresolved by the ARRC and RGB are escalated to a global Group Reputational Risk Committee ("GRRC"),

which consists of the Chief Credit Officer, the Global Head of Operational Risk Management, the Global General Counsel, the Global Head of Compliance and the Global Head of Corporate & Investment Bank Controlling.

(c)     *New Product Approval ("NPA") Policy*: All new products must go through an NPA process to ensure that reputational, legal, regulatory and tax risks are evaluated by relevant control groups.  For this purpose, "new product" is defined broadly to include all new business initiatives, products, markets, trading locations and services, and includes any changes to the risk profile of an existing business or product.  The NPA process applies to all businesses and subsidiaries.  The decision as to whether an NPA is required is initially with the sponsoring business. To ensure that NPAs are requested as required, the position of NPA Gatekeeper has been created in each business and support group.  NPA Gatekeepers are usually part of the risk management or COO structure of the Businesses/Control & Support Units and are responsible for implementing and overseeing the execution of the NPA process within their area of responsibility (Business Division and Corporate Control & Support Function).  The NPA Gatekeeper function is usually executed either by the business group COO or by the Divisional Operational Risk Officer.  Additionally, any control or support group may independently call for the submission of an NPA.

The Global NPA Policy requires the Operational Risk Management Committee to perform initial oversight of the NPA process, including review of NPA risk profiles and potential breaches of policy.  This Committee escalates any unresolved disputes to the NPA Office within Group Operational Risk Management.  The NPA Office performs further risk oversight on all NPAs and acts as the point of escalation for NPA issues or breaches to the Chief Risk Officer of the Legal Risk and Capital Executive Committee, which is ultimately responsible for managing risk and determining NPAs.

NPAs within the Americas Region must also comply with the following additional requirements.  The Americas NPA Policy is administered by the Americas Legal Entity Committee ("LEC") and its regional subcommittees.  Issues not resolved by the regional sub-committees or the full LEC are escalated to the RGB for resolution, and then, if

3

necessary, to the GRRC.  Any NPA in the Americas must be approved by senior representatives of the Legal, Treasury, Tax and regulatory control groups, independent of the business that sponsors the proposal.

All NPAs must be documented in the Global New Product Approval Database in order to ensure that a complete population of such approvals is available for management, control groups, regulators and auditors.

(d)  *Prohibited Activities - Global Markets US*: The Prohibited Activities Policy, effective November 1, 1996, forbids employees from engaging in a practice or conduct that is manipulative, illegal, anti-competitive, unethical, or contrary to industry standards or applicable regulations.

2.  Tax-Specific Policies

(a)  *Potential Tax-Avoidance Transaction Policy*: This Policy, effective March 8, 2001 and subsequently updated and revised, most recently as of July 2, 2009, requires DB to comply with the broad reporting requirements of the U.S. federal and state tax laws for "potential tax avoidance transactions."  This Policy recognizes that those requirements are broad enough to apply not only to obvious tax-avoidance transactions, but also to certain "plain vanilla" products, trades, structures or other transactions that may provide tax benefits.  This Policy requires, among other things, that DB disclose its role as a participant in or Material Advisor with respect to any "Reportable Transaction," as defined by Treasury Regulations, including: (a) Listed Transactions; (b) Confidential Transactions; (c) Contractual Protection Transactions; (d) Loss Transactions; and (e) Transactions of Interest that the Internal Revenue Service ("IRS") has publicly identified.

(b)  *Prohibited Tax-Oriented Transactions Policy*: This Policy, which is a part of the broader tax-avoidance transaction policy, prohibits DB from engaging in Listed Transactions, Confidential Transactions or Contractual Protection Transactions, as defined in the Treasury Regulations, as either a participant or a Material Advisor.  In addition, the Policy provides that Transactions of Interest may be engaged in only in consultation with Group Tax.  This Policy also requires any DB employee who becomes aware

4

that a prohibited transaction has taken place to notify Group Tax immediately.

(c) _Tax Opinion Policy on Structured Transactions_: This Policy, effective January 31, 2005, requires that any business unit engaging in a structured transaction in which DB is a participant, other than solely as an advisor, must obtain a "should" level opinion from outside counsel as to the tax consequences to DB of its participation.  Before the transaction may close, the opinion must be vetted and approved in writing by Group Tax.  Moreover, each business unit must contact Group Tax regarding a structured transaction no later than when discussions with a client or counterparty are scheduled to begin.  In its sole discretion, Group Tax may choose separate counsel to advise on the tax treatment of the proposed transaction.  If counsel does not believe a "should" level of confidence is warranted, the transaction cannot proceed.

B.    Corporate Governance Committees

1.    _Americas Regional Governance Board_: The Americas RGB provides high-level supervision of internal controls, reputational risk, regulatory issues, and business ethics and practices.  The RGB is the ultimate point of escalation for resolution of disputes or review of significant issues within the region, and it has the authority to escalate unresolved issues to the responsible Group Executive Committee member.  The Chair of the RGB is the CEO of the Americas Region, and its members include the Regional COO and the Heads of Finance, Market Risk Management, Compliance, Legal and Credit Risk Management Departments.

2.    _Americas Reputational Risk Committee_: The ARRC is a permanent sub-committee of the RGB and is responsible for reviewing, assessing and opining on all reputational risk issues brought before it by businesses or Control & Support functions.  The ARRC is required to report all of its actions within the region through the Reputational Risk Network for further aggregation and reporting to the Risk Executive Committee and the GRRC.  The Chair of the ARRC is the Regional General Counsel, and its members include the Regional COO and the Regional Head of Compliance.

3.    _Americas Region Legal Entity Committee_: In order to ensure compliance with U.S. regulatory requirements, any new legal entity or subsidiary must be reviewed and approved by the LEC and/or a relevant subcommittee.  The LEC is responsible for

oversight and risk management relating to new legal entities created within DB's business areas. LEC proposals are voted on at a committee meeting, and individual members have the right to have their opposing views reflected in the record. If the committee as a whole cannot agree on a decision, the LEC will escalate the issue to the Americas RGB.

4.  *NPA Review Committee*: The NPA Review Committee is a subcommittee of the LEC and exercises initial oversight of all NPAs. Upon submission of any NPA, the NPA Review Committee will make an initial determination as to whether an NPA is high risk or low risk. NPAs identified as high risk by regional LECs are escalated to the full LEC for review. Lower risk NPAs are reviewed by the regional subcommittee, with monthly reporting to the full LEC of all actions taken. The Committee performs oversight and monitoring of the completeness and timeliness of the NPA review process.

5.  *Group Reputational Risk Committee*: The GRRC is responsible for the approval of the regional escalation structures to assess reputational risk issues. It also reviews and makes determinations on all reputational risk issues. The GRRC is an official subcommittee of both the Risk Executive Committee and the Group Compliance Committee, and is co-chaired by the chairmen of these Committees. Standing members of the GRRC are the Chief Credit Officer, the Global Head of Operational Risk Management, the Global General Counsel, the Global Head of Compliance and the Global Head of Corporate & Investment Bank Controlling.

6.  *Operational Management Risk Committee*: The Operational Risk Management Committee ("ORMC") is responsible for reviewing the NPA risk profile of new products, reviewing any breaches of NPA policy, approving group NPAs, and ensuring that the NPA process is functioning effectively.

C.   Training Program

*Comprehensive Training Plan and Needs Analysis*: DB has a comprehensive training program for its employees, including mandatory training on certain applicable laws, rules, regulations and guidelines. Compliance and ethics are a substantial part of this program. DB does a comprehensive review of this program on an annual basis, focusing particularly on the compliance component, to identify any new areas where training is needed. DB has procedures in place to ensure that all

DB employees attend mandatory trainings, including a system to advise management when an employee fails to attend mandatory training.

II.     Verification Procedures

    A.     Initial Verification by Independent Expert

        1.     Scope of Independent Expert's Jurisdiction and Authority and Access to Information

To demonstrate that the Compliance Measures have been implemented and are effective in achieving compliance with U.S. federal income tax laws, rules and regulations, and that they constitute an effective Compliance & Ethics Program as defined in Section 8B2.1 of the 2009 edition of the United States Sentencing Guidelines Manual, DB has agreed voluntarily to retain an independent expert (the "Independent Expert") appointed by the United States Attorney's Office for the Southern District of New York ("the Office"). The Independent Expert's jurisdiction will be to evaluate the Compliance Measures set forth above in Section I and to determine whether they are adequate to achieve compliance with U.S. federal income tax laws and to prevent and detect misconduct relating to products and transactions susceptible to abuse on behalf of high net worth individuals. The Independent Expert will review and monitor DB's maintenance and execution of the Compliance Measures and, as required, any other relevant DB compliance program, and recommend such changes as are necessary to ensure that DB is implementing and maintaining an effective Compliance & Ethics Program as defined in Section 8B2.1 of the 2009 edition of the United States Sentencing Guidelines Manual. The Compliance Measures must include provisions for appropriate disciplinary measures in the event criminal conduct is detected and should ensure that employees and agents of DB may report or seek guidance regarding potential or actual criminal conduct without fear of retaliation.

The Independent Expert will have the authority to take such reasonable steps that are, in the Independent Expert's view, necessary to be fully informed about the existence and effectiveness of the Compliance Measures ("his/her jurisdiction"). To that end, the Independent Expert will have, subject to attorney-client privilege: (i) access to, and the right to make copies of, any and all books, records, accounts, correspondence, files, and any and all other documents or electronic records, including e-mails, of DB and its agents and employees, within or relating to his/her jurisdiction; and (ii) the right to interview any employee, agent, or consultant of DB and to participate in any meeting concerning any matter within or relating to his/her jurisdiction. The Independent Expert will take appropriate steps to maintain the confidentiality of any non-public information entrusted to him/her and shall share such information only with the Office.

Consistent with the description of the policies and procedures set forth in Section I.A.1.(a) above, DB and all of its employees, agents, and consultants shall have an affirmative duty to cooperate with and assist the Independent Expert in the execution of his/her duties and shall inform the Independent Expert of any information that may

relate to the Independent Expert's duties or lead to information that relates to his/her duties. In addition, DB officials, compliance officers, and employees are required to notify the Independent Expert, upon discovery, of any violations or potential violations of law relating to the Independent Expert's jurisdiction.

DB will maintain a hotline to facilitate communication anonymously or otherwise with the Independent Expert.[1] Within 10 days of the commencement of the Independent Expert's duties, DB shall advise each of its U.S.-based agents and employees, and any DB employee participating in transactions involving US income tax laws, rules, and regulations, in writing or electronically of the appointment of the Independent Expert, the Independent Expert's powers and duties as set forth herein, the telephone number established for contacting the Independent Expert, and email and mail addresses designated by the Independent Expert. Such notice shall inform employees that they may communicate with the Independent Expert anonymously or otherwise, and that no agent, consultant, or employee of DB shall be penalized in any way for providing information to the Independent Expert.

2.    Term of Independent Expert's Authority

The Independent Expert's authority set forth herein shall extend for a period of at least one year from the Independent Expert's entry on duty. If upon the year anniversary of his or her entry on duty the Independent Expert certifies that the Compliance Measures have been implemented and are effective and, in the view of the Office, DB has not violated any provision of the Non-Prosecution Agreement with Deutsche Bank AG dated December 21, 2010 (the "Non-Prosecution Agreement"), the Independent Expert's authority will be terminated. If the Independent Expert cannot so certify, or in the event that the Office determines that DB has violated any provision of the Non-Prosecution Agreement, a one-year extension of the Independent Expert's authority may be imposed in the sole discretion of the Office.

The Office shall have the power to impose additional one-year extensions of the Independent Expert's authority until at the end of any one-year period the Independent Expert is able to certify that the Compliance Measures have been implemented and are effective and the Office has concluded that there have been no violations of the Non-Prosecution Agreement during that one-year period. DB agrees that the Compliance Measures as approved by the Independent Expert will survive the termination of the Independent Expert's authority.

---

[1]    DB already has in existence a DB Americas Employee Hotline, referenced in Section I.A.1.(c) above, that may provide an effective vehicle for anonymous communication with the Independent Expert. If the Independent Expert concludes that the DB Americas Employee Hotline is not an effective vehicle for anonymous communications with the Independent Expert, DB agrees that it will establish an independent, toll-free answering service for such purpose and will advise each of its agents and employees in writing of the toll-free number and its purpose.

3.      Selection of the Independent Expert and Terms of Independent Expert's Retention

The Office will consult with DB using its best efforts to select and appoint a mutually acceptable Independent Expert (and any replacement Independent Experts, if required) as promptly as possible.  In the event that the Office is unable to select an Independent Expert acceptable to DB, the Office shall have the sole right to select an Independent Expert (and any replacement Independent Experts, if required).

The Independent Expert will have the authority to employ legal counsel, consultants, investigators, experts, and any other personnel necessary to assist in the proper discharge of the Independent Expert's duties.  The compensation and expenses of the Independent Expert, and of the persons hired under his/her authority, shall be paid by DB.  The Independent Expert, and any persons hired by the Independent Expert, shall be compensated in accordance with their respective typical hourly rates.  DB will pay bills for compensation and expenses promptly.  Any issues as to the reasonableness of the Independent Expert's activities or expenses may be brought to the attention of the Office for discussion.

DB will provide an appropriate indemnification agreement to the Independent Expert with respect to any claims arising out of the performance of the Independent Expert's duties.

The Independent Expert is not, and shall not be treated for any purpose, as an officer, employee, agent, or affiliate of DB.  DB agrees that it will not employ or be affiliated with the Independent Expert for a period of not less than one year from the date that the Independent Expert's authority is terminated.

4.      Reports and Recommendations by the Independent Expert

The Independent Expert may report to the Office whenever the Independent Expert deems fit but, in any event, shall file a written report not less often than every four months regarding: the Independent Expert's activities; the nature, extent and adequacy of the Compliance Measures in achieving compliance with U.S. federal income tax laws and the U.S. Sentencing Guidelines; and any changes to the Compliance Measures that are necessary to make them effective.  The Independent Expert may defer the filing of a written report if he or she deems appropriate, but shall file a report if requested to do so by the Office.  Such periodic written reports are to be provided to DB and the Office.  The Office may, in its sole discretion, provide all or part of any such periodic written report, or other information provided to the Office by the Independent Expert, to the IRS or any other agency the Office deems appropriate.

DB agrees to adopt all recommendations submitted by the Independent Expert unless DB objects to any recommendation and the Office agrees that adoption of such recommendation should not be required.

9

Should the Independent Expert, in the course of his or her work, determine that it appears that DB has violated any law, has violated any provision of the Non-Prosecution Agreement, or has engaged in any conduct that could warrant the modification of his/her jurisdiction, the Independent Expert shall promptly notify the Office.

B.    Subsequent Verification by DB

DB recognizes that it must institute and maintain an audit procedure to self monitor the continuing implementation and effectiveness of its compliance program, and make changes to it as required.  In addition, however, in order to ensure that the Compliance Measures continue to operate as intended following the Independent Expert's tenure, DB will implement the additional procedures set forth below within 6 months of the end of the Independent Expert's tenure, and maintain these additional procedures on an annual basis for a minimum of two years.[2]

1.    A senior representative of the Americas Group Audit Department (the "Group Audit Representative") will confirm through a certification process that the Compliance Measures are in effect and operating as required in the Americas.  As part of this process, the Group Audit Representative:

- Will request that a representative of senior management in the Americas Global Markets and Private Wealth Management businesses certify to the Group Audit Representative that they are aware of DB's above-referenced policies with respect to tax-oriented transactions and that they are not aware of any violation of those policies.

- Will request that a senior representative of Group Tax certify that the above-referenced policies with respect to tax-oriented transactions are in effect in the Americas, and that he or she is not aware of any violation of those policies.

- Will, if necessary, require sub-certifications from the Chairperson of each corporate governance committee listed above, or the Chairperson's designee, that such committee is operating as required, *i.e.*, meeting in accordance with internal policies, ensuring that

---

[2] DB will enter into a closing agreement with the IRS providing for enhanced oversight and regulatory compliance with respect to reportable transactions, registration and list maintenance.

appropriate matters are escalated, and acting on all matters that are brought to such committee's attention.

- Will supervise the preparation of a report, summarizing the certification process.

2. Additionally, DB will obtain annual certifications from all appropriate U.S.-based Directors and Managing Directors in the Global Markets and Private Wealth Management business units, and all appropriate U.S.-based Directors and Managing Directors in Group Tax, stating that they have read and understand DB's policies with respect to tax-oriented transactions, that they have complied with and will comply with these policies, and that they have not participated in and are not aware of any DB participation in transactions that are prohibited by the policies. DB shall maintain these certifications for a period of three years, and they shall be available for inspection upon request by the Office.