

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 13, 2006

Christopher S. Rizek, Esq.
Scott D. Michel, Esq.
Caplin & Drysdale, Chartered
One Thomas Circle, N.W.
Washington, D.C. 20005

Re: **HVB – Deferred Prosecution Agreement**

Dear Gentlemen:

Pursuant to our discussions and written exchanges, the United States Attorney's Office for the Southern District of New York (the "Office") and the defendant Bayerische Hypo- und Vereinsbank AG ("HVB"), pursuant to authority granted by its Management Committee in the form of a Management Committee Resolution (a copy of which is attached hereto as Exhibit A), hereby enter into this Deferred Prosecution Agreement (the "Agreement").[1]

## The Criminal Information

1. HVB will consent to the filing of a one-count Information (the "Information") in the United States District Court for the Southern District of New York (the

---

[1] The term "HVB" includes HVB Risk Management Products Inc., and HVB U.S. Finance Inc. (formerly known as HVB Structured Finance, Inc.), and HVB America, Inc.



EXHIBIT 7

EOUSA 433

"Court") charging HVB with participating in a conspiracy in violation of 18 U.S.C. § 371 to (i) defraud the United States and its agency, the Internal Revenue Service (hereinafter "IRS"); (ii) commit tax evasion in violation of 26 U.S.C. § 7201; and (iii) make and subscribe false and fraudulent tax returns, and aid and assist in the preparation and filing of said tax returns in violation of 26 U.S.C. § 7206. A copy of the Information is attached hereto as Exhibit B.

## Acceptance of Responsibility for Violation of Law

2.  HVB admits and accepts that, as set forth in detail in the Statement of Facts, attached hereto as Exhibit C, through the conduct of certain HVB employees, during the period from 1996 through 2003, HVB assisted high net worth United States citizens to evade United States individual income taxes on over $1.8 billion in capital gain and ordinary income by participating in and implementing fraudulent tax shelter transactions, including Bond Linked Issue Premium Structure ("BLIPS"), Custom Adjustable Rate Debt Structure ("CARDS"), and certain tax shelter transactions involving non-resident alien individuals and other tax-indifferent parties. HVB personnel engaged in conduct that was unlawful and fraudulent, including: (i) agreeing to participate in fraudulent tax shelter transactions; and (ii) preparing and signing false and fraudulent factual recitations, representations, and documents as part of the documentation underlying the shelters.

3.  HVB agrees that it will pay a total of $29,635,125, to the United States as part of this Agreement, which payments are attributable to the following: disgorgement of $16,195,999 of fees received by HVB from the activities described in the Statement of

2

Facts, $6,000,000 of which will be forfeited to the United States pursuant to a civil forfeiture complaint filed against HVB in the United States District Court for the Southern District of New York; restitution to the IRS of $6,989,324 for actual losses suffered by the IRS; and a penalty of $6,449,802 to settle the IRS's civil penalty examination of HVB pursuant to the closing agreement described below. HVB agrees that it will satisfy this obligation on or before February 17, 2006. In the event that HVB fails to make this payment on a timely basis, the Office, in its sole discretion, can treat the failure to pay as a violation of the terms of the Agreement or require HVB to extend the length of the Deferred Prosecution for a period of up to an additional eighteen (18) months.

4.  HVB agrees that no portion of the $29,635,125 that HVB has agreed to pay to the United States under the terms of this Agreement is deductible on any Federal or State tax or information return.

## Permanent Restrictions And Controls On HVB's Banking Practice

5.  The Office recognizes that HVB had previously implemented certain restrictions on it business and changes in its banking practices in order to improve its compliance with the tax laws. Pursuant to this Agreement, HVB agrees to implement, throughout its U.S. operations and with respect to any HVB operations affecting United States income taxes, the following permanent restrictions: (i) HVB will not develop or assist in developing, market or assist in marketing, sell or assist in selling, or implement or assist in implementing, any "listed transaction" as defined to include any transaction described in 26 U.S.C. § 6707A(c)(2); (ii) HVB also will not participate in any transaction or strategy

3

that has a significant tax component, as defined in 31 C.F.R. § 10.35(b), unless such transaction or strategy is accompanied by a "should" level opinion, which opinion HVB independently concurs with; (iii) except with regard to the audit of HVB's financial statements, HVB will not seek tax services or tax advice of any kind from the public accounting firm that conducts audits of its financial statement; (iv) HVB will adopt a new "transaction approval" process for loan officers that involves review and approval, by its Tax Director, of any transaction that has a significant tax component; and (v) HVB will abide by previously instituted operational controls that will prevent account officers from controlling banking transactions after the formal closing of the transactions.

### Cooperation

6. HVB acknowledges and understands that the cooperation it has provided to date with the criminal investigation by the Office, and its pledge of continuing cooperation, are important and material factors underlying the Office's decision to enter into this Agreement, and, therefore, HVB agrees to cooperate fully and actively with the Office, the IRS, and with any other agency of the government designated by the Office ("Designated Agencies") regarding any matter relating to the Office's investigation about which HVB has knowledge or information.

7. Consistent with its obligations under law, HVB agrees that its continuing cooperation with the Office's investigation shall include, but not be limited to, the following:

(a).  Completely and truthfully disclosing all information in its possession to the Office and the IRS about which the Office and the IRS may inquire, including but not limited to all information about activities of HVB and present and former ~~employees and agents of HVB~~;

(b).  Volunteering and providing to the Office any information and documents that come to HVB's attention that may be relevant to the Office's investigation;

(c).  Assembling, organizing, and providing, in responsive and prompt fashion, and, upon request, expedited fashion, all documents, records, information, and other evidence in HVB's possession, custody, or control as may be requested by the Office or the IRS;

(d).  Using its reasonable best efforts to make available its present and former employees to provide information and/or testimony as requested by the Office and the IRS, including sworn testimony before a grand jury or in court proceedings, as well as interviews with law enforcement authorities, and to identify witnesses who, to HVB's knowledge and information, may have material information concerning the Office's investigation, including but not limited to the conduct set forth in the Information and the Statement of Facts;

(e).  Providing testimony or information necessary to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or other proceeding as requested by the Office or the IRS, including information and testimony concerning the Office's

investigation, including but not limited to the conduct set forth in the Information and the Statement of Facts; and

(f). With respect to any information, testimony, documents, records or physical evidence provided by HVB to the Office or a grand jury, HVB consents to any and all disclosures of such materials to such Designated Agencies as the Office, in its sole discretion, deems appropriate. With respect to any such materials that constitute "matters occurring before the grand jury" within the meaning of Rule 6(e) of the Federal Rules of Criminal Procedure, HVB further consents to: (i) any order sought by the Office permitting such disclosures; and (ii) the Office's ex parte or in camera application for such orders.

8. HVB agrees that its obligations to cooperate will continue even after the dismissal of the Information, and HVB will continue to fulfill the cooperation obligations set forth in this Agreement in connection with any investigation, criminal prosecution or civil proceeding brought by the Office or by or against the IRS or the United States relating to or arising out of the conduct set forth in the Information and the Statement of Facts and relating in any way to the Office's investigation. HVB's obligation to cooperate is not intended to apply in the event that a prosecution against HVB by this Office is pursued and not deferred.

## Deferral of Prosecution

9. In consideration of HVB's entry into this Agreement and its commitment to: (a) accept and acknowledge responsibility for its conduct; (b) cooperate with the Office and the IRS; (c) make the payments specified in this Agreement; (d) comply

6

with Federal criminal laws, including Federal tax laws; and (e) otherwise comply with all of the terms of this Agreement, the Office shall recommend to the Court that prosecution of HVB on the Information be deferred for the period of eighteen months from the date of the signing of this Agreement. HVB shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of New York for the period during which this Agreement is in effect.

10. The Office agrees that, if HVB is in compliance with all of its obligations under this Agreement, the Office will, at the expiration of the period of deferral (including any extensions thereof), seek dismissal without prejudice as to HVB of the Information filed against HVB pursuant to paragraphs 1 and 9 of this Agreement. Except in the event of a violation by HVB of any term of this Agreement, the Office will bring no additional charges against HVB relating to its participation in BLIPS, CARDS, and transactions involving non-resident alien individuals ("NRAs") and other tax-indifferent parties, including 357(c) and Common Trust Fund tax shelter transactions, as described in the Statement of Facts. This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than HVB. Specifically, this Agreement provides protection only for the four tax shelters enumerated herein — BLIPS, CARDS, 357(c), and Common Trust Fund tax shelter transactions. HVB and the Office understand that the Agreement to defer prosecution of

HVB must be approved by the Court, in accordance with 18 U.S.C. § 3161(h)(2). Should the Court decline to approve the Agreement to defer prosecution for any reason, both the Office and HVB are released from any obligation imposed upon them by this Agreement, and this Agreement shall be null and void.

11. It is further understood that should the Office in its sole discretion determine that HVB has, after the date of the execution of this Agreement: (a) given false, incomplete or misleading information, (b) committed any crime, or (c) otherwise violated any provision of this Agreement, HVB shall, in this Office's sole discretion, thereafter be subject to prosecution for any federal criminal violation of which the Office has knowledge, including but not limited to a prosecution based on the Information or the conduct described therein. Any such prosecution may be premised on any information provided by or on behalf of HVB to the Office or the IRS at any time. Any such prosecutions that are not time-barred by the applicable statute of limitations on the date of this Agreement may be commenced against HVB within the applicable period governing the statute of limitations. In addition, HVB agrees to toll, and exclude from any calculation of time, the running of the criminal statute of limitations for a period of 5 years from the date of the execution of this Agreement. By this Agreement, HVB expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay. Such waivers are knowing, voluntary, and in express reliance on the advice of HVB's counsel.

EOUSA 440

12. It is further agreed that in the event that the Office, in its sole discretion, determines that HVB has violated any provision of this Agreement, including HVB's failure to meet its obligations under this Agreement: (a) all statements made by or on behalf of HVB to the Office and the IRS, including but not limited to the Statement of Facts, or any testimony given by HVB or by any agent of HVB before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Office against HVB; and (b) HVB shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of HVB before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence. It is the intent of this Agreement to waive any and all rights in the foregoing respects.

13. HVB agrees that, in the event that the Office determines during the period of deferral of prosecution described in paragraph 9 above (or any extensions thereof) that HVB has violated any provision of this Agreement, a one-year extension of the period of deferral of prosecution may be imposed in the sole discretion of the Office, and, in the event of additional violations, such additional one-year extensions as appropriate, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed five years.

9

14. HVB agrees that it shall not, through its attorneys, agents, or employees, make any statement, in litigation or otherwise, contradicting the Statement of Facts or its representations in this Agreement. Consistent with this provision, HVB may raise defenses and/or assert affirmative claims in any civil proceedings brought by private parties as long as doing so does not contradict the Statement of Facts or such representations. Any such contradictory statement by HVB, its present or future attorneys, agents, or employees shall constitute a breach of this Agreement and HVB thereafter shall be subject to prosecution as specified in paragraphs 9 through 12, above, or the deferral-of-prosecution period shall be extended pursuant to paragraph 13, above. The decision as to whether any such contradictory statement will be imputed to HVB for the purpose of determining whether HVB has breached this Agreement shall be at the sole discretion of the Office. Upon the Office's notifying HVB of any such contradictory statement, HVB may avoid a finding of breach of this Agreement by repudiating such statement both to the recipient of such statement and to the Office within 48 hours after receipt of notice by the Office. HVB consents to the public release by the Office, in its sole discretion, of any such repudiation.

## The Compliance & Ethics Program

15. In addition to the remedial actions that HVB has taken to date, HVB shall implement and maintain, throughout its U.S. operations and with respect to any HVB operations affecting United States income taxes, an effective compliance and ethics program that fully comports with the criteria set forth in Section 8B2.1 of the United States Sentencing Guidelines (the "Compliance & Ethics Program"). As part of the Compliance

10

& Ethics Program, HVB shall maintain a permanent compliance office and a permanent educational and training program relating to the laws and ethics governing the work of HVB's employees. HVB agrees that all HVB professionals and any employees of HVB shall receive appropriate training pursuant to the Compliance & Ethics Program within one year of the execution of this Agreement, and shall be given such training on a regular basis. Also as part of the Compliance & Ethics Program, HVB shall (a) ensure that an effective program be maintained to punish violators of laws, policies, and standards, and reward those who report such violators; (b) ensure that no employee, agent, or consultant of HVB is penalized in any way for providing information relating to HVB's compliance or noncompliance with laws, policies, and standards to any HVB official, government agency, or compliance officer. HVB shall take steps to audit the Compliance & Ethics Program to ensure it is carrying out the duties and responsibilities set out in this Agreement.

## Closing Agreement With The IRS

16. HVB and the IRS will enter into a closing agreement pursuant to 26 U.S.C. § 7121 providing for resolving the examination of HVB under 26 U.S.C. §§ 6694, 6700, 6701, 6707, 6708, 7407, and 7408, relating to BLIPS, CARDS, 357(c) and Common Trust Fund tax shelter transactions, and pursuant to which HVB will pay the $6,449,802 civil penalty described in paragraph 3 above.

## The Office's Discretion

17. HVB agrees that it is within the Office's sole discretion to choose, in the event of a violation, the remedies contained in paragraphs 3, 11, and 12 above, or instead

11

to choose to extend the period of deferral of prosecution pursuant to paragraph 13. HVB understands and agrees that the exercise of the Office's discretion under this Agreement is unreviewable by any court. Should the Office determine that HVB has violated this Agreement, the Office shall provide notice to HVB of that determination and provide HVB with an opportunity to make a presentation to the Office to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution.

### Limits Of This Agreement

18.    It is understood that this Agreement is binding on the Office and the Department of Justice but specifically does not bind any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities. However, if requested by HVB or its attorneys, the Office will bring to the attention of any such agencies, including but not limited to any regulators, the Agreement, the cooperation of HVB, and its compliance with its obligations under this Agreement.

### Public Filing

19.    HVB and the Office agree that, upon filing of the Information in accordance with paragraph 1 and 9 hereof, this Agreement (including the Statement of Facts and the other attachments hereto) shall be filed publicly in the proceedings in the United States District Court for the Southern District of New York.

EOUSA 444

### Integration Clause

20. This Agreement sets forth all the terms of the Deferred Prosecution Agreement between HVB and the Office. No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, HVB's attorneys, and a duly authorized representative of HVB.

MICHAEL J. GARCIA
United States Attorney
Southern District of New York

By: *[signature]*
Stanley J. Okula, Jr.
Kevin Downing
Justin S. Weddle
Margaret Garnett
Assistant United States Attorneys

*[signature]*
Lev L. Dassin
Chief, Criminal Division

*[signature]*
Shirah Neiman
Chief Counsel to the U.S. Attorney

Accepted and agreed to:

*[signature]*
Caplin & Drysdale, Chartered
Christopher S. Rizek, Esq.
Scott D. Michel, Esq.

*[signature]*
HVB AG, by Jan Kupfer

*[signature]*
HVB AG, by Christopher J. Wrenn

13

## Statement of Admitted Facts

1. The parties entering the Deferred Prosecution Agreement and agreeing to the statement of facts set forth herein are Bayerische Hypo- und Vereinsbank AG and HVB U.S. Finance Inc. Bayerische Hypo- und Vereinsbank AG is a Germany-based financial institution that operated in the United States through its branch at 150 East 42d Street, New York, New York. It is and was the parent to various subsidiaries, including HVB Risk Management Products Inc., HVB U.S. Finance Inc. (formerly known as HVB Structured Finance Inc.), and HVB America Inc. Collectively, all of the foregoing entities are referred to herein as "HVB."

2. As set forth in more detail below, between 1996 and 2002 HVB participated in a number of fraudulent tax shelter transactions devised by others, including a series of transactions known as "Bond Linked Issue Premium Structure" ("BLIPS"), Custom Adjustable Rate Debt Structure" ("CARDS"), "common trust fund," and "357(c)" transactions. HVB's activities in connection with these and other transactions included: (i) participating in transactions purporting to be loans that were not bona fide loans; (ii) participating in trading activity on instructions from promoters that was intended to create the appearance of investment activity but that had no real substance; (iii) participating in creating documentation that contained false representations concerning the purpose and design of the transactions; and (iv) engaging in activity with others, including accounting firms, investment advisory firms, various individuals affiliated with those entities, lawyers, and clients (defined herein to include the high net worth U.S. individuals and the purported entities they created who participated in the transactions to obtain and generate the tax losses), all directed toward the implementation of the tax shelters designed to defraud the United States.

3. The conduct described herein occurred under the supervision and direction of HVB's then-employee Domenick DeGiorgio ("DeGiorgio") and others in DeGiorgio's group. DeGiorgio rose to be a senior vice president of HVB's subsidiary, HVB Structured Finance Inc., and he ran a group of HVB employees known as the Financial Engineering Department ("FNE"). Internally at HVB, DeGiorgio accurately described many aspects of the shelter transactions that should have led HVB to refuse to participate in the transactions. However, DeGiorgio also made false and misleading representations concerning the legitimacy of various transactions to HVB personnel. HVB's wrongful conduct is largely derived from the wrongful actions of DeGiorgio, but HVB placed DeGiorgio in a senior position, permitted him to operate and manage FNE with few controls, and rewarded him for generating substantial guaranteed fees for the bank by participating, with the approval of the bank, in tax shelter transactions. HVB therefore accepts full responsibility for its participation in these transactions and for HVB's failure to prevent and detect them.

4. HVB's supervisory and internal controls at the time failed to prevent and detect the improper and illegal conduct by DeGiorgio and HVB's involvement with the fraudulent tax shelter activity. Specifically, for example, HVB did not have proper policies and procedures for analyzing tax-motivated transactions in which HVB was participating nor for involving the Tax Department in an appropriate analysis and approval process for such transactions. Further, DeGiorgio colluded with other individuals and entities outside of HVB to evade the

internal control systems that were then in place at HVB with respect to the receipt and distribution of tax shelter fees among co-conspirators, including DeGiorgio.

## Fraudulent Tax Shelter Activities

5. HVB participated in various tax shelter transactions, including approximately 29 BLIPS TRANSACTIONS, approximately 29 "Custom Adjustable Rate Debt Structure" ("CARDS") TRANSACTIONS, a series of 23 "common trust fund" transactions, and several transactions referred to as "357(c)" transactions.

### BLIPS

6. DeGiorgio brought the BLIPS transactions to HVB through his prior contacts with the principals of a West Coast tax shelter promoter, who were former employees of the international accounting firm KPMG. DeGiorgio was initially contacted in early August, 1999 by a partner in the West Coast tax shelter promoter, who claimed that his firm, KPMG, and others had developed a tax shelter program for high net-worth individuals, and asked if HVB would participate in the transactions. DeGiorgio advised other HVB officers that another bank had financed a number of the same transactions, and that the other bank wanted additional financial services providers to participate in the program.

7. Over the course of the subsequent months, DeGiorgio and others at HVB took the steps necessary to have the BLIPS series of transactions approved within HVB. HVB obtained a set of form transaction documents from a New York law firm ("Law Firm No. 1") that had prepared them for the other bank referred to in paragraph 6. DeGiorgio and others in the FNE group also prepared and circulated a credit request memorandum that summarized the BLIPS transaction and sought the internal credit approvals. The credit request memorandum underwent several revisions and multiple levels of review, including even a meeting between DeGiorgio and the management of HVB in Munich, Germany. The BLIPS credit memo set forth various aspects of the BLIPS transactions that made clear that: the transactions were solely tax-motivated and in practical terms involved no credit or investment risks; although couched as 7-year transactions, the BLIPS transactions were fully expected to be unwound within 60 days; and HVB's profit potential on the BLIPS transactions was substantially dependent on the transactions being unwound within 60 days.

8. HVB personnel were aware that the BLIPS transactions were unusual and did not fit within HVB's established banking procedures at the time. Accordingly, HVB personnel had to create special procedures in order to enter the transactions on HVB's accounting books and records.

9. HVB obtained a copy of a draft KPMG opinion on the underlying tax merits of the BLIPS transaction, and it was aware that a major New York law firm ("Law Firm No. 2") was being paid to provide a separate opinion to the purported investors. HVB also obtained its own opinion from Law Firm No. 1 with regard to whether it had any tax shelter registration and list maintenance obligations, but it did not seek or obtain an independent opinion with respect to the legitimacy of the BLIPS transactions, based on the true facts of the transactions.

Both of the aforementioned opinions, which HVB reviewed, were based on certain incomplete, false, and misleading representations, including misrepresentations about facts well known to HVB.

10. HVB participated in a first tranche of BLIPS transactions in 1999. In order to complete the transactions in time for them to be unwound 60 days later but still before the end of the year, they had to be entered hurriedly in October, 1999. As a consequence, KPMG personnel were located at HVB's New York offices to assist in compiling the required loan closing materials and documentation. Permitting KPMG personnel to complete HVB's documentation and to conduct HVB's processing of the BLIPS transactions was a departure from ordinary bank practices and inconsistent with HVB's own "know your customer" procedures.

11. The "loans" entered into by HVB in the BLIPS transaction were not bona fide. The purported loans had no legitimate business purpose other than reducing the taxes of the BLIPS customers. Moreover, the entities to which the "loans" were made were not creditworthy, their only significant assets were the proceeds of the "loans," and these assets were in turn pledged as collateral for the "loans" themselves. The "funds loaned" to the clients in the BLIPS transactions were required to be deposited back into demand deposit accounts in the clients' names at HVB. As a consequence, the only purported movements or transfers of funds in connection with the "loans" were made via entries on HVB's books of account, and none of the funds "loaned" ever left HVB's custody and control. Finally, HVB did not set aside any of its existing capital or go to the capital markets to acquire funds to make the purported loans.

12. HVB, however, agreed to help prepare and execute documents that made it falsely appear the "loans" were part of a purported highly-leveraged investment program on the part of the clients. There was no highly leveraged investment program. The forward contracts that involved shorting foreign currencies pegged to the U.S. dollar (hereinafter referred to as "the forward contracts") were funded through separate cash funds provided by the clients as part of the "all-in" cost for participating in BLIPS. Nonetheless, the transaction documents made it appear that "loan" funds were borrowed to provide "leverage" for the forward contracts, which were to be the ostensible foreign currency investments of the clients in the BLIPS transactions. In fact, the borrowed funds could not be used for this purpose and thus did not provide any leverage. In addition, although the documents used to implement the transactions stated that the forward contracts could serve as collateral for the purported loan, in practical terms these contracts had no value and therefore would not have provided any collateral for the purported loan in the event of a loan "default." Moreover, the "loans" were documented as seven year loans with options to "unwind" after 60 days or 180 days. This was necessary in order for the unusual "premium" structure of the purported loans to generate the illegal tax benefits sought by the clients. In fact, however, it was prearranged that all the "borrowers" would unwind their transactions in 60 days, and the clients never had any intention to maintain the loans for longer periods. It was because of all of these arrangements and agreements that HVB saw no need to set aside capital or acquire funds to fund the "loans." HVB wrongfully agreed to this structure and to these misrepresentations made by participants

in the transactions, including that they were entering into a highly leveraged investment program, and that they were really entering transactions with seven-year loans.

13. The transactions were designed to create the false impression that the client/"borrowers" had entered seven-year loans with an unusual "premium" structure at an interest rate well above prevailing market rates. In fact, the "loans" were entered using an estimated interest rate figure that was necessarily inaccurate, since the actual nominal rate was not known until approximately one week after the initial "loans" were entered. At that time, the clients and HVB entered interest rate swaps with a retroactive effective date to the date of the initial book entries, setting the "nominal" rate on the principal portion of the loan that generated the purported "premium." The net effect of the swaps, however, was that the clients would pay only a market rate of interest on the full amount of the loaned funds (principal and purported "premium"). In other words, although the "loans" were represented in the transaction documents and opinion letters to be above-market, fixed-rate loans with a premium, they were intended from inception to be variable-rate loans with no premium. This entire series of transactions was necessary for the purported loans to generate the illegal tax benefits sought by the clients, and had no other legitimate business purpose.

14. HVB, with other entities, professionals and the clients, participated in creating, accepting, or transmitting documents, including loan and loan-related agreements and representation letters, which contained false representations designed to assist the clients in achieving unlawful tax benefits. In addition to the misrepresentations described above, these included specific statements in representation letters signed by DeGiorgio and others, on behalf of HVB, that HVB would not require early termination of the BLIPS transactions nor require assignment of the loans. These statements were meant to convey the false impression that the BLIPS transactions were in the ordinary course of HVB's banking business. Similarly, the documents falsely suggested that the loan term might extend for the full seven years, when in fact HVB and its co-conspirators knew that was not the case, and that there was a possibility that the loans would not be assigned, when in fact the assignments were pre-arranged and fully expected and understood to occur, because those steps were integral to the tax strategy involved.

15. Although individual clients entered the BLIPS transactions with HVB, the transactions were approved by HVB in two tranches, in the aggregate. In a departure from routine banking practices, HVB did not subject the individual clients to scrutiny as to their creditworthiness, in substantial part because it was understood that the funds purportedly loaned would never leave the custody and control of HVB. Likewise, the forward contracts, which HVB conducted on behalf of the BLIPS clients, were executed in the aggregate at the direction of the West Coast tax shelter promoter and then allocated among the individual clients' BLIPS transactions. The absence of individual treatment of the BLIPS clients was a departure from HVB's ordinary practices and inconsistent with routine banking procedures.

16. In the course of entering the BLIPS transactions, HVB acceded to instructions from the West Coast tax shelter promoter to show both sides of certain currency swap transactions on separate confirmation tickets, rather than grouped onto one ticket as was

HVB's ordinary practice. HVB's representatives acceded to this request and altered the documentation despite it being inconsistent with HVB's ordinary practice. In fact, there was no business purpose for documenting the transactions as the West Coast tax shelter promoter instructed HVB. Rather, the sole purpose for this instruction was to make it appear that the currency trades were separate parts of a substantive investment strategy, which was not the case.

17. All of the BLIPS transactions in the first tranche in fact were unwound at the 60-day mark, before the end of 1999, so that the clients could claim phony tax losses in that year. Despite knowing that all of the first BLIPS transactions had been unwound in 60 days, HVB nevertheless engaged in a second tranche of BLIPS transactions in 2000, based on the same false and misleading documentation.

### Other Transactions

18. HVB participated with various entities, professionals and clients in other tax shelter transactions besides BLIPS that involved similarly fraudulent and illegal elements.

19. For example, under DeGiorgio's supervision HVB participated in a series of transactions known as "CARDS" (for "Custom Adjustable Rate Debt Structure"), in which HVB made loans with a purported 30-year term, when all parties involved, including the clients/"borrowers," knew that the transactions would be unwound in approximately one year in order to generate the phony tax benefits sought by the client participants. In other words, the documentation used to implement CARDS, including documentation created and executed by HVB, falsely stated that the loans were 30-year loans whereas, in truth and fact, as HVB and other participants knew and understood, they were loans of approximately one year in duration. The CARDS transactions also involved false representations, on the part of DeGiorgio on behalf of HVB, and on behalf of the clients/"borrowers," that the transactions were being entered for legitimate business purposes and that the material terms of the loan agreements had been negotiated at arms length. In fact, these representations were untrue, and the transactions were prearranged by the promoters to be unwound within one year and had no purpose other than generating tax benefits for the clients involved.

20. In order to generate the improper tax benefits, the CARDS transactions also involved the participation of an ostensibly neutral third party who was not a resident of the United States. HVB and its co-conspirators knew that the foreign third parties who entered the CARDS transactions were merely nominees who had no legitimate business purpose in entering the transaction and who were simply being paid to lend their neutral U.S. tax status to the transaction in order to enable the U.S. client to obtain their claimed tax benefits.

21. Such puppet, tax-neutral parties were similarly present in other transactions entered by HVB, including several so-called 357(c) transactions. These nominees operated under the direction of DeGiorgio and others and were not bona fide participants in the tax shelter transactions. Instead, they were used by the tax shelter promoters as entities and people

to whom taxable income would be assigned so that the United States citizens who participated in the transactions could falsely claim tax losses to eliminate the taxes they owed.

22. In connection with these transactions, including CARDS and the 357(c) transactions, DeGiorgio improperly manipulated internal HVB demand deposit accounts, through which various payments related to these transactions were run. These accounts were also misused by DeGiorgio for a variety of personal purposes unrelated to the business of HVB. HVB acknowledges that permitting loan officers to have control over such internal accounts was inconsistent with proper banking practices. Prior to the investigations into tax shelters conducted by various Government agencies, HVB changed its procedures to no longer permit such accounts, and it has implemented additional controls to prevent a recurrence of DeGiorgio's improper conduct.

23. Another recurring feature of the tax shelter transactions that DeGiorgio involved HVB in is that they were all promoted by many of the same individuals, all of whom had close ties to DeGiorgio. Some of these individuals colluded with DeGiorgio to evade HVB's internal controls and to enable the improper use of funds in the accounts. Again, HVB acknowledges that its controls at the time were insufficient to prevent and detect DeGiorgio's misuse of these accounts, and it has implemented additional controls to prevent a recurrence.

## Post Transaction Conduct

24. Prior to the grand jury investigation, HVB took a number of steps to exit the tax shelter business. These included:(i) disbanding the FNE department and ending participation in the aforementioned tax shelter transactions, which led to the departure of DeGiorgio and others; (ii) improving internal controls, specifically no longer permitting account officers to control transaction accounting after closing, requiring additional customer loan servicing reports to account officers and credit officers, eliminating retail accounts for internal departments, and revising the credit approval process; and (iii) providing HVB's Tax Department with greater oversight responsibilities. HVB wants to ensure its continuing compliance with the law and adherence to the highest levels of integrity and ethics in its financial practices.

25. HVB cooperated with the IRS during its investigation and provided substantial and important assistance to the investigating agents and prosecutors during the course of the grand jury investigation in the Southern District of New York. Among other things, HVB waived its attorney-client privilege with respect to the transactions at issue; it made various personnel from HVB, including a member of HVB's management committee, available for numerous interviews; at substantial expense to HVB, it engaged an independent outside consultant to ensure the integrity of the subpoena compliance process and facilitated access by the Government to large databases of HVB material and voluminous documents; and it responded to numerous requests from investigators and prosecutors for various specific items of information. HVB also brought to the government's attention evidence concerning DeGiorgio's efforts wrongfully to enrich himself and to misuse HVB accounts he controlled.

26. As part of its own compliance program and in connection with the Deferred Prosecution Agreement, HVB is undertaking additional compliance improvements, including: (i) agreeing not to obtain any tax services from its audit firm or professionals in that firm; (ii) implementing new procedures regarding the review and approval of transactions that have potential tax benefits, and the Tax Department's compliance with IRS opinion standards and registration and list maintenance obligations; (iii) a training and educational program for relevant personnel regarding compliance with tax and banking laws, and (iv) adoption of ethics and "best practices" guidelines for HVB employees to follow in carrying out bank duties. In addition, HVB has agreed to pay a total of $29,635,125 to the United States, which includes: disgorgement of fees collected in connection with the aforementioned tax shelter transactions; payment to the IRS of civil penalties related to its list maintenance and registration obligations in connection with the transactions under investigation; and restitution to the IRS. HVB has also pledged to, and will continue to, cooperate with any investigation relating to its tax shelter activities.